Donald JOHNSON, Appellant

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2011–SC–000137–MR.

Supreme Court of Kentucky.

Aug. 29, 2013.

Rehearing Denied Nov. 21, 2013.

David Hare Harshaw III, Assistant Public Advocate, Katherine Marie Dittmeier Holm, Department of Public Advocacy, LaGrange, KY, for Appellant.

Jack Conway, Attorney General, David Bryan Abner, Assistant Attorney General, Office of Criminal Appeals, Office of the Attorney General, Frankfort, KY, for Appellee.

Opinion of the Court by Justice NOBLE.

The Appellant, Donald Herb Johnson, has collaterally attacked his murder conviction and death sentence, alleging that his unconditional, "blind" guilty plea was coerced in two ways. He claims first that his guilty plea was induced by a secret deal (or his belief in the existence of a secret deal) in which the trial judge indicated that he would not sentence Johnson to death if he entered a guilty plea. He also claims that his plea was coerced by his lawyer's threat to withdraw from the representation if Johnson did not enter a guilty plea. The trial court ruled that the proof did not support Johnson's claims and denied the motion. This Court affirms.

## I. Background

In November 1989, "Helen Madden was beaten, stabbed, mutilated, and tortured to death in the supply storage room of the Laundromat where she worked. Her body was so disfigured that a co-worker of thirteen years was unable to identify her." *Johnson v. Commonwealth*, 103 S.W.3d 687, 690 (Ky.2003). She had also been sexually assaulted. Johnson was arrested and prosecuted for the crimes.

In 1994, Johnson appeared before a special judge, John David Caudill,[1] and en-

---

1. Judge Caudill had been assigned to the case because the regular judge of the Perry Circuit

tered an unconditional guilty plea to charges of murder, first-degree burglary, and two counts of first-degree sexual abuse. The prosecution, which was seeking the death penalty, asked for jury sentencing. Johnson opposed this and asked that the judge sentence him. Though he did not raise the issue at that time, Johnson now claims that he was induced to enter the guilty plea by a promise from Judge Caudill to give him less than the death penalty and his lawyer's threat to withdraw from the representation. On an interlocutory appeal, this Court held that the prosecution "can insist on jury-recommended sentencing over a defendant's objection." *Id.* (citing *Commonwealth v. Johnson*, 910 S.W.2d 229 (Ky.1995)). The case was remanded for a jury sentencing hearing. *Id.*

After this Court remanded the case, Johnson moved to withdraw his guilty plea. At that time, he again did not raise any issue about an alleged promise by the trial judge to give him less than the death penalty. His motion was denied.

In 1997, a few months before the sentencing hearing, Johnson's defense counsel, Mike Williams and Kelly Gleason, withdrew from his representation. They claimed to have been ineffective by failing to advise Johnson that he could have entered into a conditional guilty plea and that he had the right to a speedy trial. Another lawyer, Vince Yustas, was assigned to the case and represented Johnson at the sentencing hearing. According to Yustas, Williams and Gleason led him to believe the judge had either agreed to or in some way indicated that he would give Johnson life without the possibility of parole for 25 years (LWOP 25) instead of death. Yustas claimed he believed them

and thus worked to get the prosecution to agree to judge sentencing instead of the jury sentencing it could demand. He was successful and ultimately the prosecution consented to sentencing "solely by the trial court without intervention of a jury." *Id.*

Yustas admitted that shortly before the sentencing hearing was to be held, the prosecution stated that it would seriously consider an offer of LWOP 25 if Johnson would make one. Johnson made no such offer, however, and the matter proceeded to sentencing.

After the sentencing hearing, Judge Caudill sentenced Johnson to death. On direct appeal, this Court affirmed. *Id.* at 698.

Johnson then filed a motion under RCr 11.42 collaterally attacking his sentence and conviction. He raised numerous issues in that motion, including his claim that his guilty plea should be set aside as involuntary because he was "under the belief that the trial judge had agreed to sentence him to life without parole for twenty-five years." *Johnson v. Commonwealth*, 2006–SC–000548–MR, 2008 WL 4270731, at *1 (Ky. Sept. 18, 2008).

In the RCr 11.42 motion, he alleged that the lead member of his trial team, Mike Williams, threatened to withdraw from the representation and thus bullied him into entering the guilty plea. He also claimed that he "reluctantly agreed to plea, but only because the [trial judge] had convinced him, and his attorneys, that the judge would give him LWOP 25." The motion included numerous allegations about a "secret deal," including that the trial judge had *ex parte* contact with the defense and Johnson, that at one point the judge had asked whether Johnson would

Court had recused. Though Judge Caudill was a special judge, he is sometimes referred to herein as the original trial judge in order to

differentiate him from a second special judge who eventually heard the collateral-attack motion giving rise to this case.

accept a sentence of LWOP 25 (to which he said yes), and that the defense team believed there was a "firm commitment" to such a sentence if Johnson entered a guilty plea. The motion also alleged that the lawyers tried to get the trial judge to put his commitment on the record but that he refused because he "would be a fool to do such a thing, and that they would just have to trust him."

Judge Caudill denied the motion without holding an evidentiary hearing. This Court affirmed except as to the issue of the voluntariness of the guilty plea. *Id.* This Court was concerned primarily with whether there had been "judicial interference" in the plea process. *Id.* On that issue, this Court "h[e]ld that the trial court erred when it failed to conduct an evidentiary hearing on the merits of Johnson's claim because material issues of fact exist that cannot be proved or disproved upon the face of the record." *Id.* This Court also noted that "Johnson raise[d] a question about whether he was coerced when his counsel allegedly threatened to withdraw from the case, which is not resolved upon this record." *Id.* at *3. The matter was remanded for an evidentiary hearing on these issues, and Judge Caudill was ordered disqualified because he would "necessarily be a witness in the evidentiary hearing." *Id.*

On remand, another special judge, Eddy Coleman, was assigned to the case. He held a multiple-day evidentiary hearing over the course of several months exploring what exactly had transpired in the time leading up to Johnson's guilty plea. Fourteen witnesses testified at the hearing. Among them were Johnson, various members of his defense team, Judge Caudill, and several members of the judge's staff, including his former court reporter and law clerk.

Johnson, of course, testified that he believed some sort of deal had been reached. He stated that at one point, while only his lawyers and a bailiff were present with him, the judge approached him and asked whether he would take LWOP 25, to which he said yes. He also testified that his lawyers later unsuccessfully tried to get the judge to go on the record concerning this "plea offer." He also testified that he was later told by his lawyers that the judge and prosecutors had agreed that if he was to be sentenced to death, he could withdraw his guilty plea. On cross-examination, he admitted that he did not tell his appellate lawyers about the alleged deal. He claimed this was because he heard voices that told him not to tell his lawyers (Johnson is a diagnosed schizophrenic), but he did reveal this to counsel when he was finally medicated, after the conclusion of his direct appeal.

Several members of Johnson's defense team testified either that they were convinced that some sort of secret deal had been reached or at least that assurances had been made, based on various statements by Mike Williams and the short conversation in which the judge had allegedly asked Johnson if he would take LWOP 25. Others testified that they believed the judge had obliquely communicated that he would not give the death penalty, though they did not go so far as to describe it as a "deal."

Kelly Gleason, the second chair on Johnson's defense team, testified that she believed Williams and the judge had discussions without the prosecution present. In fact, she stated that the judge "conduct[ed] a lot of business *ex parte* in his office" and that Williams had several private meetings with the judge. She testified that Williams urged Johnson to take a blind plea because he believed the judge would not give the death penalty if the judge

conducted the sentencing (as opposed to jury sentencing). Gleason was uncomfortable with the idea of a blind plea, however.

She testified that her view about Johnson's entering a blind plea changed after she heard a short exchange between Johnson and the judge at the Floyd County Courthouse annex. According to her testimony, she, Johnson, Williams and a bailiff were waiting for the county attorney to arrive to address an issue related to expert witness funds (which, at that time, the county would have paid). While they were waiting, she claimed, the judge asked if Johnson would take LWOP 25, to which Johnson said yes. She interpreted this as the judge assuring them that he would not give Johnson death.

She also testified that the issue of the "deal" was discussed while the team was preparing for the oral argument before this Court in the interlocutory appeal on whether the prosecution could insist on jury sentencing. She claimed she told Williams that if asked about a deal with the judge, he should admit to it, but that he refused to do so. She also testified that even though Williams was not asked about the issue at the argument, he raised it himself, saying that if the Court had the impression there might have been some sort of deal, that was not correct.

Gleason also testified about Williams's alleged threat to quit the case. She claimed that Williams yelled at Johnson and threatened to quit if he insisted on going to trial, which led Johnson to enter the guilty plea. During her testimony, a copy of a memorandum allegedly written by Mike Williams to her in 1996 was entered into evidence. (Williams later could not remember having written it.) Gleason testified that the memorandum was written to her in response to a conversation she had had with Williams about an investigation by the Public Advocate into whether Williams had threatened clients to get them to plea in which Gleason did not reveal the alleged threat to quit Johnson's case. She explained that she "lied" in the investigation to protect Williams.

In the memorandum, Williams (if he wrote it) denied ever giving an ultimatum to a client. He did state that "the 'words' may have been spoken, and perhaps improvidently chosen in the context of the conversation" but that he "ha[d] never used those words out of the context of a broader conversation about options a client may have had." Later in the memo, he stated: "[I] know [I] would never have told this to a client in the terse fashion it has been represented to me." The memo also asked Gleason to raise any issues she might have with such incidents when they first became apparent to give him an opportunity to deal with them "immediately." He also attributed her perception that he had pressured Johnson to "a misunderstanding which mutual communication will clarify."

The memo also includes Gleason's handwritten notes that she believed Williams was unstable and that she was "afraid of him." The notes also stated that she believed he would lie if asked about threatening to withdraw from the representation, and mentioned his alleged lie to this Court during oral argument. She testified that she wrote the notes on the memo and then hid a copy in an unexpected part of the file because she worried that Williams would try to "scrub" the file. She also testified that she did not recall any attempt to get the judge to put the "deal" on the record.

Gary E. Johnson, a retired DPA attorney who consulted with the defense team, testified that he heard from other members of the team that Williams had received assurances from the judge and that a deal was essentially in place, but that Williams would not disclose the nature of

the assurances. He testified that he tried to get Williams to reveal the assurances or, at the very least, to be sure to get something on the record to reflect said deal and to avoid the record not reflecting the truth. He also testified that he told Williams that the judge had sentenced several people to death, possibly having gone so far as to refer to the judge as a serial killer, in an attempt to get Williams to get the deal on the record if it existed. Williams resisted, according to Johnson, because the judge had told him the "deal" would not go through if he revealed it. He also testified that Williams was beginning to be negatively affected by the pressure and that he believed, based on his knowledge of the judge, that there might actually not be a deal and that Williams was making it up.

George Sornberger, a supervisor at DPA, testified that he had conversations with Mike Williams about conversations Williams had with Judge Caudill. According to Sornberger, Williams told him that he had two separate conversations in which the judge stated he would not give the death penalty if Johnson pleaded guilty.

Other members of the defense team, particularly Vince Yustas, testified that they did not believe a "deal" had been reached but that based on what Williams said, the death penalty was not on the table at the time of the sentencing. Yustas described this as the judge having, in some way, communicated obliquely— "sometimes a message would be sent"— that he would not impose the death penalty. He also testified that such a practice was not uncommon or unheard of, and that he used such situations to the clients' advantage. He also testified that he believed judge sentencing would be better in this case because the crime was so gruesome; he reasoned that a judge would likely be able to avoid being inflamed by the graphic evidence and thus there would be a better chance of avoiding the death penalty.

William Spicer, one of Johnson's original trial lawyers, testified that Mike Williams told him that he "had an indication from the judge" that Johnson would get less than death.

The defense mitigation specialist, Chris Brown, testified to a meeting with Williams and the judge in the law library in Floyd County. She said that this meeting was an attempt to get the judge to put the details of the deal on the record. According to her, Williams outlined a deal by which Johnson would plead guilty and a sentencing hearing would be held; if the judge felt a sentence less than death was appropriate, the plea would stand; if the judge felt death was appropriate, Johnson would be allowed to withdraw his plea. Brown claimed that the judge declined to put any such deal on the record, but he did not deny what Williams had laid out.

She also testified that she had written an entry in the "trial diary" reflecting this meeting, though no such entry appears in the portions of the diary that were entered into evidence and apparently was missing. She also testified about another portion of the diary she wrote, which was entered into evidence, stating the judge had previously been "willing to go with something less than death upon a guilty plea" but that "all agreed that if the jury gave the death penalty the judge would feel inclined to give death as well." This entry was typed after this Court decided that the Commonwealth could insist on jury sentencing. She testified that how this part of the entry was written (referring to her in the third person where the rest is written in the first person from her perspective) suggested that another team member may have written it.

Mike Williams, on the other hand, testified that there was no deal and that he had no assurances from the judge. He explained his strategy in recommending Johnson enter the plea was based on his belief that the best chance for Johnson to avoid death was judge sentencing. He explained that this view was driven by his "reading" the judge in light of his knowledge of the judge's personality, his personal experience with multiple death-penalty cases, and the brutality of the murder, which he believed would drive any jury to give the death penalty.

Williams did, however, admit that some version of the funding meeting at the annex had occurred. He testified that he believed Gleason and Johnson were present. He testified that at some point the judge said, "If you could get ... LWOP 25, would you take that?" to which Johnson said, "Well, yeah." He denied having any other private conversations about reaching a deal or plea bargain, other than conversations in passing about whether the parties were close to a deal. He testified that he did not tell Johnson that this conversation meant the judge would not impose death if he entered a blind plea, and that instead he thought it was simply the judge seeing if the parties were close to reaching a deal, that is, a plea bargain.

Williams also denied telling other members of the defense team that he had had ex parte communications with the judge or that he had received any oblique communications that the death penalty was off the table. Williams also denied having threatened Johnson to force him to enter a guilty plea.

Williams was asked about a discussion of the annex incident in a memo to Gary Johnson in which he wrote, "Both Kelly [Gleason] and I interpreted the statements of Judge Caudill as a 'message' that death would not be imposed if Don [Johnson]

was willing to accept LWOP/25 and enter a plea." Williams testified that this did not mean he believed there was a deal for a blind plea or that the judge was telegraphing what he would do on a blind plea. Rather, he explained, the statement reflected his belief that he thought the judge would accept a plea agreement with the Commonwealth for LWOP 25 and would not depart from such a plea agreement.

When finally asked why his testimony differed so much from the rest of the defense team, he stated:

> Because they follow the principle—it's very common at DPA and you're aware of it—that whatever it takes to avoid death, you do. Like I heard at the very first DPA seminar I attended, the dustiest book on your shelf should be the book on ethics. I don't agree with that, never have agreed with that, and I think it's offensive to our profession.

Williams was called back to testify at the end of the hearing (he had been one of the first witnesses called). He was confronted with various documents that had been entered into evidence through other witnesses. For example, when asked about the trial diary entry by Chris Brown stating that the judge was "willing to go with something less than death upon a guilty plea" but that "all agreed that if the jury gave the death penalty the judge would feel inclined to give death as well," he agreed that this was the consensus. He explained the entry as coming in the context of the fight over jury-vs.-judge sentencing, and that again he had believed, based on his "read" of the judge, that he would not give death if a jury was not involved in the sentencing, but that the judge would probably feel compelled to follow a jury's sentence.

This, of course, led to questions about whether the judge had made statements committing him to a sentence of less than

death if a plea agreement could be reached with the Commonwealth. Williams stated that the judge never committed or "put it in those words" but may have said things like he was "inclined" or saw no problem with following such an agreement.

Williams was also asked about what defense counsel claimed were inconsistencies between his earlier testimony and his subsequent testimony. For example, he suggested at his second round of testimony that he believed the timing of the guilty plea was bad because other issues (such as Johnson's mental health) could have been explored further, whereas he had previously testified that he believed a blind guilty plea (with judge sentencing) was the best chance of avoiding death. He explained that he did believe the timing was bad, but that the issues would ultimately amount to nothing (since nothing changes with a guilty but mentally ill verdict) and that he did not want to try to pressure Johnson once he had made up his mind to plead guilty.

Judge Caudill also testified that there was no "deal" and that he had no memory of asking Johnson if he would take LWOP 25. He admitted that he may have inquired about the possibility of settlement, and that Williams may have said to him at some point that Johnson was interested in such a deal and that he (the judge) might have then asked "Would you take it if the Commonwealth offered it to you?" Court staff corroborated Williams's and the judge's version of events to the extent that they could recall no conversations between the judge and Johnson, despite also testifying to always being present during court proceedings.

After hearing all the testimony, Judge Coleman entered findings of fact and conclusions of law resolving the remaining portions of Johnson's RCr 11.42 motion. As to the question of judicial interference

in the plea process, the special judge concluded that Johnson "was not promised a life sentence in exchange for a guilty plea by the trial judge or anyone else" and that "[t]here is simply no credible evidence to find otherwise." As to whether Johnson's lawyer coerced him by threatening to withdraw, the judge concluded "that trial counsel did not threaten to withdraw if the defendant refused to plead guilty." In reaching these conclusions, the judge went through the testimony of various witnesses and explained why he did or did not believe them. And, based on these conclusions, he denied Johnson's motion for relief under RCr 11.42.

Johnson now appeals that decision to this Court as a matter of right. *See* Ky. Const. §§ 110(2)(b) & 115; *Leonard v. Commonwealth*, 279 S.W.3d 151, 155 (Ky. 2009) ("This Court has exclusive appellate jurisdiction over death penalty matters, even when the appeal involves a collateral attack on a sentence of death.").

## II. Analysis

■ There is no question that "[a] guilty plea, if induced by promises or threats which deprive it of the character of a voluntary act, is void" and that "[a] conviction based upon such a plea is open to collateral attack." *Machibroda v. United States*, 368 U.S. 487, 493, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962). Ordinarily, such promises or threats come from the prosecuting attorney, as was alleged in *Machibroda*.

■ But the conduct of the defendant's own trial counsel can also make the plea involuntary. *See, e.g., Bronk v. Commonwealth*, 58 S.W.3d 482, 487 (Ky.2001). In fact, "a multitude of events occur in the course of a criminal proceeding which might influence a defendant to plead guilty or stand trial." *Id.* (citation, quotation

marks, and brackets omitted). Thus, "the trial court must evaluate whether errors by trial counsel significantly influenced the defendant's decision to plead guilty in a manner which gives the trial court reason to doubt the voluntariness and validity of the plea." *Id.*

■ Additionally, the conduct of a trial judge can also render a plea involuntary. This can occur when "a trial court becomes deeply involved in the process of plea negotiations" and thereby "risks misleading the parties." *Haight v. Commonwealth,* 760 S.W.2d 84, 89 (Ky.1988); *see also Commonwealth v. Corey,* 826 S.W.2d 319, 321 (Ky.1992).

In *Haight,* the trial judge declined to say he was bound by a plea agreement but nevertheless stated that it was his general policy to sentence defendants according to the Commonwealth's recommendation under a plea agreement. 760 S.W.2d at 87. However, at sentencing, the judge exceeded the recommended sentence and refused to allow the defendant to withdraw his guilty plea. *Id.*

The Court noted that it had previously held "that if the defendant was misled by the action of the trial court, refusal to allow withdrawal of his guilty plea would amount to an abuse of discretion." *Id.* at 88 (discussing *Couch v. Commonwealth,* 528 S.W.2d 712 (Ky.1975)). It then noted that the record demonstrated that the defendant had been "misled at the time he entered his guilty plea." *Id.* Specifically, the defendant had been misled as to whether the trial court would depart from the sentence recommended in the plea agreement.[2] *Id.* As a result, the Court vacated the trial court's judgment accepting the guilty plea.

In *Corey,* the Court was concerned about the trial judge taking over the Commonwealth's role in plea bargaining. In that case, the judge issued an unusual order stating the defendants should be allowed to enter *Alford* pleas and "that if death or life without parole for 25 years should be required at the sentencing phase, the defendants would be allowed to withdraw their pleas of guilty and proceed to trial by jury." *Corey,* 826 S.W.2d at 320. That order was the type of judicial interference condemned in *Haight. Id.* at 321. This Court stated that trial judges should not be "introduce[d] ... into the plea bargaining process" nor should they "supplant the role of the Commonwealth and the defendant in making the tentative agreement." *Id.* This Court also stated "that the plea agreement shall be between the defendant and the Commonwealth's Attorney," not the defendant and the court, because "of the role conferred upon the trial court." *Id.*

Though *Haight's* and *Corey's* facts differ somewhat from the allegations in this case, the conceptual framework is the same. Indeed, it was primarily the *Haight* and *Corey* framework that led this Court to remand this case for an evidentiary hearing in the first place. *See Johnson,* 2006–SC–000548–MR, 2008 WL 4270731, at *3 (citing *Haight* and *Corey* ). Of course, the judge's alleged interference in the plea process is not the only issue in the case. There is also the question whether the conduct of Mike Williams, as defense counsel, was such as to make Johnson's plea involuntary.

As discussed above, Judge Coleman found that Judge Caudill had not impermissibly injected himself into the case. Specifically, he found that no "secret deal"

2. This case was from before RCr 8.10 was amended to specifically allow a defendant to withdraw a guilty plea if the trial court rejects the plea agreement and intends to depart from the sentence recommended in such an agreement.

had been reached and that no credible evidence would suggest otherwise. In making this finding, he discussed the proof, including the competing versions of what happened, and specifically found that the testimony of the original trial judge and Johnson's lead counsel were convincing. He also found that Johnson's counsel had not threatened him. The judge's decision turned on these factual findings.

Johnson disputes these findings, arguing that the evidence shows otherwise. Thus, the legal issue in this case is whether the trial court's factual findings are in error.

■■■ While mixed questions of law and fact in collateral proceedings, such as whether a lawyer has been ineffective, are reviewed *de novo, Brown v. Commonwealth,* 253 S.W.3d 490, 500 (Ky.2008), that standard is not universally applicable to every decision a judge makes in such a proceeding. Where the trial court has made unmixed findings of fact, such findings may be set aside on appeal only if they are clearly erroneous. CR 52.01; *McQueen v. Commonwealth,* 721 S.W.2d 694, 698 (Ky.1986).

> When reviewing a trial court's findings under the clear error standard, the appellate court must determine whether or not those findings are supported by substantial evidence. Though substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established, it does not mean the evidence must be absolutely compelling or lead inescapably to but one conclusion. Rather, substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion, or evidence that has sufficient probative value to induce conviction in the minds of reasonable men.

*CertainTeed Corp. v. Dexter,* 330 S.W.3d 64, 72 (Ky.2010) (citations, quotation marks, and brackets omitted).

■■■ In applying this standard, "due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." CR 52.01. This means an appellate court will defer to the trial court in most instances because of the "trial court's opportunity to see the witnesses and observe their demeanor on the stand," *McQueen,* 721 S.W.2d at 698, and the fact that "recognition must be given to its superior position to judge their credibility and the weight to be given their testimony," *id.*

Johnson essentially argues that the trial court improperly weighed the testimony of various witnesses, chose a complicated take on the facts over a simple one (and thereby failed to apply the principle of Occam's razor), and accepted inconsistent and contradictory testimony (specifically that of Mike Williams). For these reasons, Johnson argues, the trial court's findings were clearly erroneous. This Court cannot agree.

A large portion of Johnson's brief is dedicated to recounting the minutiae of various witnesses' testimony and pointing out how that testimony contradicted the testimony of witnesses supporting Judge Coleman's findings. But that is simply not a sufficient reason to find clear error. In essence, Johnson claims that because more witnesses testified in his favor, his version of the facts must be true. But resolving the conflict between the competing versions of the facts is a job for the trial court, not an appellate court. The special judge did so in this case, and found either that those witnesses were not credible or gave little weight to their testimony.

As one example, Judge Coleman noted that one of Johnson's witnesses, George Sornberger, testified that a conversation

between Williams and Judge Caudill occurred in a courthouse breezeway. But, as Judge Coleman pointed out, there is no breezeway in the courthouse, which made the testimony unbelievable.

Johnson attacks this conclusion by noting that the witness in question "admitted to a foggy memory" and that the breezeway testimony was "something that *may* have been said to him." It is unclear how this undermines Judge Coleman's finding. In fact, a witness's foggy memory and admission that something may have been only hearsay further undermines his testimony.

As another example, Judge Coleman dismissed the testimony of former DPA lawyer Gary E. Johnson, because he testified to having told Williams that Judge Caudill was a "serial killer" who had given the death penalty many times. Judge Coleman found that such a characterization of a judge's lawful judgments brought disrepute on the bench and bar, which undermined the witness's credibility. He also noted that this testimony was contradicted by the fact that Judge Caudill had only been on the bench 18 months when Johnson's case was first before him and thus could not at that point have handed down several death sentences. As a result, the judge wrote that he "d[id] not believe the testimony of Gary Johnson," and that "[a]t best, it is fanciful."

Johnson attacks this finding as unjustified, since it was but a single lapse by the witness and the error was only a minor detail. But again, it is the trial court's job, not this Court's, to evaluate the credibility of witnesses and to weigh their testimony.

And the trial court's finding that the witness was not credible is not unreasonable.

▆▆▆ Johnson also claims there are inconsistencies in the testimony supporting Judge Coleman's decision, which he argues makes the factual findings clearly erroneous. But even if there are such inconsistencies,[3] they do not make the judge's findings clearly erroneous. The simple fact is that there are inconsistencies throughout the testimony of the various witnesses, including those who supported Johnson's claim. It was Judge Coleman's job, and his alone, to resolve those inconsistencies and determine what actually happened to the extent possible. This Court cannot, and will not, second guess that aspect of a trial court's decision.

Johnson also argues that the various documents entered into evidence, particularly the trial diary, show that Williams's testimony was false. Again, Judge Coleman was not bound to believe these documents over the testimony of Williams. But, more importantly, Johnson's proposed reading of the documents is strained at best. For example, one of the entries states that Williams and Gleason interpreted the interaction with Judge Caudill at the annex "as a 'message' that death would not be imposed if Don was willing to accept LWOP/25 and enter a plea." Johnson claims this shows that Williams believed a deal existed, or at least communicated that fact to him. But, as Williams explained in his testimony, this entry is just as consistent, if not more so, with the idea that the judge had indicated he would accept a plea agreement—with the Commonwealth—and

3. For example, Johnson argues that Williams's testimony changed on the second day of his testimony. Johnson claims that on the first day, Williams claimed to have supported the guilty plea as the only viable way to avoid the death penalty but that on the second day Williams claimed the guilty plea was against his advice. But this is actually a misreading of the second day's testimony. What Williams actually testified to was that he did not like the timing of the plea, having thought at the time that there were still other issues that could be litigated before resorting ultimately to the plea.

was not making a promise regarding an unconditional, blind plea by Johnson.

Another entry states that "whereas before the judge was willing to go with something less than death upon a guilty plea all felt and agree that if the jury gave the death penalty the judge would feel inclined to give death as well." Despite Johnson's claim, this does not prove the existence of a deal. Rather, it is consistent with Williams's claim that the team, him included, believed that Johnson's best chance of avoiding death was to be sentenced by the judge, which they believed could be accomplished by entering a guilty plea. (Of course, that turned out not to be the case, since this Court held that the Commonwealth could insist on jury sentencing, which is why Johnson sought at that time to withdraw his guilty plea.)

Ultimately, this Court concludes that there was substantial evidence to support Judge Coleman's findings that there never was a secret deal and that Johnson's lawyer did not coerce him into pleading guilty by convincing him that there was a deal. Judge Caudill's and Mike Williams's testimony support these findings. That Johnson's supporting witnesses outnumbered and contradicted these witnesses does not make their testimony insubstantial. That Judge Coleman stated that some of these witnesses actually supported his findings, when they may in fact have been more supportive of Johnson's claims, does not change the fact that several witnesses did, in fact, testify that there was no deal and that Johnson was never told there was a deal. Thus, this Court cannot say that the findings were clearly erroneous.

This conclusion is buttressed by the fact that Johnson swore in open court at his guilty plea that he was not promised anything or coerced into pleading guilty.

While such sworn statements are not conclusive, they do, as this Court noted in remanding the case for the evidentiary hearing, "carry a strong presumption of verity." *Johnson*, 2006–SC–000548–MR, 2008 WL 4270731, at *3 (quoting *Edmonds v. Commonwealth*, 189 S.W.3d 558, 569 (Ky.2006)). Those statements alone were insufficient to find that Johnson was not coerced, since they were contradicted by his RCr 11.42 motion, *id.*, but when combined with Judge Coleman's findings, they are convincing that Johnson was not in fact coerced.

 The more difficult issue in this case is whether Johnson may have believed there was a deal, based on some version of the conversation that may have occurred between Johnson and the trial judge, and Williams's claims of the existence of a deal, even if no actual deal existed. In fact, Johnson has argued repeatedly, both to Judge Coleman and to this Court, that what matters is not whether there actually was a deal but whether Johnson *believed* there was one, based on Judge Caudill's and Mike Williams's statements to him.

In fact, he goes so far as to suggest that all the rest of the witnesses, including Judge Caudill (for the most part) were consistent, since the conversation in the annex, whatever form it took, could be read innocently by itself, and that it is only Mike Williams's alleged statements to Johnson and the defense team that would lead Johnson to believe that conversation with the judge meant anything other than his inquiring about the possibility of a settlement. Thus, Johnson argues, the only witness that would have to be disbelieved to go his way is Mike Williams. This is where he argues that Occam's razor [4] should come into play and require

---

4. "In the 14th century, William of Ockham (1285–1349), an Englishman, wrote a book

Judge Coleman to accept the "simple" answer (that Mike Williams was lying) over the complex answer (that many other witnesses were not telling the truth).

Judge Coleman's findings do not address this claim directly, though he necessarily found it to be unsupported by the evidence. Moreover, he did find that there was "no credible evidence" that a deal existed. But, at the very least, "the pertinent issue is whether defendant had a bona fide belief that such a promise was made, and whether that belief was reasonably based upon the conduct of all parties concerned, including the plea judge." *State v. Poli,* 112 N.J.Super. 374, 271 A.2d 447, 450 (1970). Given Judge Coleman's finding of no credible evidence, this Court concludes that no reasonable person would have believed a deal existed.

Moreover, while Occam's razor is a useful guide in many aspects of decision-making, it is not an irrefutable principle of logic or the law, and it never compels a result, stating at best a preference for "simple" theories and outcomes. Thus, again, the fact that Johnson has more witnesses to support his claim, and that it might be simpler to disbelieve the testimony of a single witness rather than half a dozen, does not require that his claim be accepted. Such a practice would remove from the trial judge any need to assess the credibility of witnesses or weigh their testimony and instead allow (or even require) the judge to side with whomever has the most witnesses. That is not judging; it is the absence of judgment, requiring only the mechanical weighing of the number of

witnesses on each side, and makes a mockery of the scale as a symbol of justice.

Moreover, it is presumptuous in the extreme to assume that the simpler theory is that a lawyer would lie to his colleagues and his client when the client's life is on the line and then continue to lie about it twenty years later. Mike Williams suggested an even simpler theory that is equally unpersuasive: that for some lawyers, any practice is acceptable if it will help a client avoid the death penalty.

Indeed, the best proof Johnson has to support his claim that he believed a deal was in place is the fact that he turned down what may have been a plea offer from the prosecution for the sentence he was seeking. Vince Yustas testified that the prosecution said it would seriously consider an offer from Johnson to plead guilty in exchange for LWOP 25. Johnson turned this down supposedly because he believed that he already had a deal with the judge; he wanted to go ahead with a sentencing trial so that he could see his family; and he decided that if he was going to get a life sentence he wanted the judge to give it to him rather than "do it myself."

Once again, however, it is clear that Judge Coleman found this proof unconvincing. Weighing the proof and judging credibility is the function of the trial judge in such cases. Moreover, this not a case where the judge simply disbelieved the defendant's evidence and based his findings solely on the lack of proof. In this case, there was substantial proof from Mike Williams (as to his interactions with

---

entitled *Commentary on the Sentences.* In it, he devised what is known as *Occam's razor* ...: *Entia non sunt multiplicanda praeter necissitatem* (lit., "entities are not to be multiplied beyond necessity"). In plain English, this means that the simplest of competing theories is preferable to the more complex

ones; or that the parts of an argument should never be multiplied any more than necessary.... Another term for *Occam's razor* is the *law of parsimony."* Bryan A. Garner, *Garner's Modern American Usage* 584 (3d ed.2009).

Johnson) to support a conclusion that Johnson did not believe in the existence of a secret deal.

Additionally, this Court cannot say that Judge Coleman's conclusion that Williams did not threaten or otherwise coerce Johnson was clearly erroneous. Like the finding discussed above, there was far more than a scintilla of evidence to support his finding. That is sufficient to require this Court to defer.

Finally, it is worth noting that Johnson's claims are also undermined by the fact that they simply contradict each other. He claims on the one hand that he pleaded guilty because he believed his lawyer had obtained a favorable back-room deal for him but on the other hand that he pleaded guilty because his lawyer threatened to quit. In other words, he complains alternately that he was coerced by the carrot or the stick. But if he entered the plea because of the alleged deal, then why would his lawyer have to threaten him? While alternative pleading is acceptable, that is not what Johnson has done. He purports to present a coherent explanation for why he entered his guilty plea, but his competing explanations—that he was coerced by the carrot and the stick—cannot coexist.

### III. Conclusion

Ultimately, the proof in this case is more consistent with the idea that at most, Judge Caudill had inquired about the possibility of a deal being reached in the case. Possibly, such an inquiry was driven by the funding concerns that ran throughout the case in the early 1990s, when the county would have been responsible for much of the defense's costs. But it requires a substantial leap to believe that such an inquiry was in fact a promise to give a certain sentence upon an unconditional, blind plea. While the judge likely tried to nudge the case toward a plea agreement,

the proof simply does not show that he interfered with the process in the manner condemned in *Haight* and *Corey.*

Moreover, the proof supports a finding that Johnson's lawyer did not threaten or otherwise coerce him into pleading guilty.

Judge Coleman's findings after this Court's remand reflect this proof. Those findings are supported by substantial evidence and therefore are not clearly erroneous. For that reason, this Court affirms.

All sitting. All concur.

