******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ROBINSON, J., with whom McDONALD, J., joins, dissenting. I respectfully disagree with the majority's conclusion that the power of the defendant, the Commissioner of Transportation (commissioner), under General Statutes § 13b-36 (a)[1] to take "facilities" via the power of eminent domain does not extend to certificates of public convenience and necessity issued pursuant to General Statutes § 13b-80.[2] I conclude that § 13b-36 (a) allows the commissioner to use the power of eminent domain to take these certificates that grant a bus company, such as the plaintiffs in the present cases,[3] the right to operate a given route on particular roadways.[4] In my view, the majority's reading of § 13b-36 (a) to the contrary is inconsistent with the statute's plain language, and interferes with the commissioner's charge to promote mass transportation services under General Statutes §§ 13b-4[5] and 13b-32.[6] Because I would affirm the judgments of the trial court granting the commissioner's motion for summary judgment in these cases, I respectfully dissent.

I agree with the majority's recitation of the underlying facts and procedural history. I also agree with the majority with respect to certain general principles that inform our review, in particular, that, under *Gray Line Bus Co.* v. *Greater Bridgeport Transit District*, 188 Conn. 417, 423, 449 A.2d 1036 (1982), the "plaintiffs each hold a property right in their own certificates that cannot be taken by the state without due process of law," namely, revocation or suspension in accordance with § 13b-80, or condemnation under the eminent domain power if delegated to the commissioner by the legislature. See, e.g., *Northeastern Gas Transmission Co.* v. *Collins*, 138 Conn. 582, 586–87, 87 A.2d 139 (1952). Moreover, "when [the legislature] delegates to another the power to exercise the right of eminent domain, the extent of the power is limited by the express terms or clear implications of the statute authorizing its exercise." Id., 592. Finally, the question before us, namely, whether the commissioner's exercise of the condemnation power was indeed legislatively authorized, presents us with an issue of statutory construction, over which our review is plenary. See, e.g., *Kelo* v. *New London*, 268 Conn. 1, 13, 843 A.2d 500 (2004), aff'd, 545 U.S. 469, 125 S. Ct. 2655, 162 L. Ed. 2d 439 (2005).

"When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the

text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . . The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation." (Internal quotation marks omitted.) *Gonzalez* v. *O & G Industries, Inc.*, 322 Conn. 291, 302–303, 140 A.3d 950 (2016).

I begin with the text of § 13b-36 (a), which provides: "The commissioner may purchase *or take* and, in the name of the state, may acquire title in fee simple to, or any lesser estate, interest or right in, *any land, buildings, equipment or facilities* which the commissioner finds necessary for the operation or improvement of transportation services. The determination by the commissioner that such purchase or taking is necessary shall be conclusive. Such taking shall be in the manner prescribed in subsection (b) of section 13a-73 for the taking of land for state highways." (Emphasis added.) It is undisputed that the certificates at issue in this case must be "facilities" to be subject to condemnation under § 13b-36 (a). Because § 13b-36 (a) does not define the term "facilities," in accordance with General Statutes § 1-1 (a), we look to the term's "commonly approved usage," as ascertained by reference "to the common understanding of the term as expressed in a dictionary." (Internal quotation marks omitted.) *State* v. *Agron*, 323 Conn. 629, 635,    A.3d    (2016). The dictionary definition of "facilities" is broad and expansive. For example, Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) defines "facility," in relevant part, in the singular as "something that makes an action, operation, or course of conduct easier" or "something (as a hospital) that is built, installed, or established to serve a particular purpose."[7] Another widely used dictionary defines the word "facility" even more broadly as "[s]omething that facilitates an action or process. Often used in the plural." American Heritage College Dictionary (4th Ed. 2007). Consistent with these definitions, the United States Court of Appeals for the Second Circuit has described the word "facilities . . . as a *widely inclusive* term, embracing *anything* which aids or makes easier the performance of the activities involved in the business of a person or corporation."[8] (Emphasis added; internal quotation marks omitted.) *Hartford Electric Light Co.* v. *Federal Power Commission*, 131 F.2d 953, 961 (2d Cir. 1942), cert. denied, 319 U.S. 741, 63 S. Ct.

1028, 87 L. Ed. 1698 (1943); see also id. (power company's "corporate organization, contracts, accounts, memoranda, papers and other records, in so far as they are utilized in connection with such sales," were "facilities" in interstate commerce subjecting it to jurisdiction of Federal Power Commission). Thus, it is significant to me that nothing in the common definition of the word "facility" limits its use to "tangible assets," as compared to what the majority deems "intangible operating rights."

The breadth of the term "facilities" is well demonstrated by the Missouri Supreme Court's decision in *Mashak* v. *Poelker*, 367 S.W.2d 625, 628 (Mo. 1963), which considered whether a local juvenile court was legislatively authorized to hire a court administrator pursuant to a state statute providing that " '[a] county may establish medical, psychiatric and *other facilities*, upon request of the juvenile court, to provide proper services for the court in the diagnosis and treatment of children coming before it and these facilities shall be under the administration and control of the juvenile court.' " (Emphasis in original.) The court held that the phrase "other facilities," as used in the statute, authorized the hiring of the court administrator; it rejected the plaintiff's argument that "the word as used in the context of the statute does not mean a person but instead denotes inanimate rather than human agencies." Id., 628. In support of this conclusion, the court cited the broad dictionary definition of the term "facilities," a statute authorizing a liberal construction of the juvenile court act to promote the welfare of children, and case law including *State ex rel. Knight* v. *Cave*, 20 Mont. 468, 475–76, 52 P. 200 (1898), which held that teachers and their services are "school facilities" for purposes of a tax statute. See *Mashak* v. *Poelker*, supra, 629–31. Tellingly, the Missouri Supreme Court rejected the plaintiff's argument founded on ejusdem generis, "that the general words must be restricted to the particular classes or things enumerated," to use "medical" or "psychiatric" to restrict the meaning of "other facilities," observing that doctrine is "an aid to construction and not a positive rule of law and never overrides an intention that is clear."[9] Id., 630.

Given the broad dictionary definition and common usage of the term "facilities," I conclude that the certificates are "facilities" within the meaning of § 13b-36 (a) because they aid or facilitate the operation of the plaintiffs' businesses by granting them rights to operate their buses on the designated routes.[10] Moreover, although it is a "well established proposition that [t]he authority to condemn [is to] be strictly construed in favor of the owner of the property taken and against the condemnor," it similarly is axiomatic that "[t]he statute . . . should be enforced in such a way as to effectuate the purpose for which it was enacted." (Internal quotation marks omitted.) *Kelo* v. *New London*,

supra, 268 Conn. 24. Given the breadth of the definition of "facilities," an application of the logical principle known as Occam's razor[11] supports a reading of § 13b-36 (a) that, by allowing the condemnation of the certificates, aids the commissioner in executing his statutory mandate to promote and coordinate public transportation in the state, including ventures such as the Hartford-New Britain Busway. See General Statutes § 13b-4 (1), (2), (3) and (4); see also General Statutes § 13b-11b (a) (3) (requiring commissioner to develop and report strategy for, inter alia, "increas[ing] the use of public transportation and ride sharing so that at least ten per cent of all trips between home and places of employment occur in vehicles occupied by more than one person by the year 2000"). To read § 13b-36 (a) otherwise would be to foster the impermissibly bizarre result of handcuffing the commissioner by allowing him to take a bus company's fleet or buildings, but not its operating rights over a particular route for purposes of consolidation or combination of routes, including for the purpose, as in this case, of lowering the state's transit subsidy expenses by allowing for those new routes to be competitively bid on the open market.[12]

To this end, the statutory scheme demonstrates the legislature's intent that the commissioner's powers be expansive, insofar as General Statutes § 13b-23[13] affords the commissioner "incidental" powers to supplement the "express powers" granted by statute as "necessary or proper for the effective performance of [the commissioner's] powers and duties."[14] The incidental powers of § 13b-23 are consistent with case law permitting the exercise of eminent domain powers by "clear [implication]" from the statutes, as well as their express terms. *Northeastern Gas Transmission Co.* v. *Collins*, supra, 138 Conn. 592. Accordingly, I conclude that § 13b-36 (a) authorized the commissioner's exercise of the power of eminent domain over the plaintiffs' certificates.

The majority, however, views the statutory scheme differently, notwithstanding the commissioner's charge with respect to the promotion of mass transit and the expansive powers by which he can accomplish that legislatively declared public policy goal. I emphasize my specific disagreement with the majority's reliance on the statutory scheme governing transit districts; see General Statutes § 7-273b et seq.; and specifically General Statutes § 7-273e (a),[15] which gives transit districts the power of eminent domain over bus companies' "property and franchises . . . ." Particularly given that eminent domain powers may be granted to the commissioner by clear implication; see *Northeastern Gas Transmission Co.* v. *Collins*, supra, 138 Conn. 592; I believe that the transit district statutes support a reading of § 13b-36 (a) that gives the commissioner the right to take the certificates.

I begin with the majority's textual arguments in con-

nection with the transit district statutes, which the majority uses, in conjunction with the maxim that "[w]here a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject . . . is significant to show that a different intention existed"; (internal quotation marks omitted) *State* v. *B.B.*, 300 Conn. 748, 759, 17 A.3d 30 (2011); in support of the proposition that "when the legislature intended for a delegation of takings power to allow for the acquisition of a bus company's operating rights, the legislature granted that power explicitly." Although this argument, at first glance, seems compelling, a closer examination of the statutes cited by the majority reveals that this principle is inapplicable. In particular, § 7-273e (a), relied on by the majority, expressly grants transit districts the power to "acquire all or a portion of the property *and franchises* of any company or companies operating a transit service in the district . . . ." (Emphasis added.) In my view, the comparison urged by the majority fails because the legislature did not use the term "facilities" *in addition* to the word "franchises" in its grant of the eminent domain power in § 7-273e (a), instead using the term "property" therein to encompass both real and personal property. In contrast, I read § 13b-36 (a) to refer illustratively to tangible real and personal property by using the terms "land, buildings, [and] equipment" prior to employing the catch-all term "facilities" to describe all other types of property subject to acquisition. Put differently, had the legislature used the word "facilities" in addition to "franchises" in § 7-273e (a), that statute would be far more persuasive evidence that the legislature did not intend the term "facilities" as used in § 13b-36 (a) to encompass operating rights.[16]

Moreover, allowing transit districts, but not the commissioner, to take operating franchises runs afoul of the precept of "legislative consistency," namely, that the "legislature is always presumed to have created a harmonious and consistent body of law," thus requiring us to look "to the broader statutory scheme to ensure the coherency of our construction." (Internal quotation marks omitted.) *Sokaitis* v. *Bakaysa*, 293 Conn. 17, 23, 975 A.2d 51 (2009). This principle of legislative coherence remains paramount, despite the fact that § 13b-36 (a) and the transit district statutes were, as the majority observes, enacted at different times. See *Commission on Human Rights & Opportunities* v. *Board of Education*, 270 Conn. 665, 688 n.22, 855 A.2d 212 (2004). Examination of the statutory scheme reveals that it would be particularly incoherent to grant transit districts greater power than is afforded the commissioner because the commissioner has statewide responsibility over transportation matters and transit districts are, as quasi-municipal entities, creatures of the state with only those limited powers that are granted by their enabling stat-

utes, General Statutes § 7-273b et seq. See, e.g., *Wright* v. *Woodridge Lake Sewer District*, 218 Conn. 144, 148, 588 A.2d 176 (1991); see also *In re Westport Transit District*, 165 B.R. 93, 97–98 (Bankr. D. Conn. 1994) ("the transit-district enabling statutes cannot be interpreted as generally authorizing [the transit district] to file a [bankruptcy] petition"). Indeed, the statutory scheme expressly contemplates that the transit districts coordinate transit systems in their boundaries in the place of the commissioner, who generally has the authority to modify or overrule the transit districts' decisions should he determine, in an appeal, that they "would affect state-wide transportation policy adversely . . . ." General Statutes § 7-273d.[17] Most tellingly, the statutory scheme governing transit districts specifically contemplates direct oversight by the commissioner over transit districts' taking of operating franchises, with § 7-273e (b)[18] expressly setting forth a detailed procedure by which the commissioner may determine the "[s]uitability" of such a taking. In my view, it would defy the principle of legislative coherency to grant the commissioner direct oversight over transit districts, including in the exercise of their eminent domain powers over operating franchises, while not affording the commissioner those same eminent domain powers in the first instance.

Given the plain and unambiguous language of § 13b-36 (a), when viewed in conjunction with the commissioner's expansive charge to implement and promote mass transit, I conclude that the commissioner's power to take "facilities" extends to certificates issued pursuant to § 13b-80. I, therefore, would affirm the judgments of the trial court granting the commissioner's motion for summary judgment.

Accordingly, I respectfully dissent.

[1] General Statutes § 13b-36 (a) provides: "The commissioner may purchase or take and, in the name of the state, may acquire title in fee simple to, or any lesser estate, interest or right in, any land, buildings, equipment or facilities which the commissioner finds necessary for the operation or improvement of transportation services. The determination by the commissioner that such purchase or taking is necessary shall be conclusive. Such taking shall be in the manner prescribed in subsection (b) of section 13a-73 for the taking of land for state highways."

[2] General Statutes § 13b-80 provides in relevant part: "No person, association, limited liability company or corporation shall operate a motor bus without having obtained a certificate from the Department of Transportation or from the Federal Highway Administration pursuant to the Bus Regulatory Reform Act of 1982, P.L. 97-261, specifying the route and certifying that public convenience and necessity require the operation of a motor bus or motor buses over such route. . . . The department may amend or, for sufficient cause shown, may suspend or revoke any such certificate. The department may impose a civil penalty on any person or any officer of any association, limited liability company or corporation who violates any provision of any regulation adopted under section 13b-86 with respect to routes, fares, speed, schedules, continuity of service or the convenience and safety of passengers and the public, in an amount not to exceed one hundred dollars per day for each violation. . . . Any certificate issued pursuant to this section by the Division of Public Utility Control within the Department of Business Regulation prior to October 1, 1979, shall remain valid unless suspended or revoked by the Department of Transportation."

[3] The plaintiffs in the civil actions that were consolidated and gave rise

to this appeal are DATTCO, Inc., Collins Bus Service, Inc., Nason Partners, LLC, and The New Britain Transportation Company.

[4] I recognize that the question of whether operating rights granted by certificates issued pursuant to § 13b-80 are exclusive in nature is currently being litigated in a separate, consolidated civil action pending in the judicial district of New Britain; see *DATTCO, Inc.* v. *Dept. of Transportation*, Superior Court, judicial district of New Britain, Docket No. CV-10-6007261-S (June 8, 2012) (54 Conn. L. Rptr. 139); which was filed prior to the actions underlying this appeal. By way of background, I note that, in that action, the trial court, *Hon. George Levine*, judge trial referee, concluded that the operating right conferred by § 13b-80 is exclusive, and continued a previously granted temporary injunction precluding the commissioner from entering into contracts that would permit other bus companies to operate over those routes, portions of which were to be served by CT Fastrak service created in conjunction with the Hartford-New Britain Busway. Id. The parties subsequently entered into a stipulation in that case that permitted the commissioner to execute contracts for the provision of bus service on portions of those routes, and required the commissioner to enter into contracts with the plaintiff DATTCO, Inc. for certain of those routes, thus allowing the commencement of CT Fastrak service. I do not consider in this dissenting opinion whether Judge Levine properly concluded that the operating rights granted by the certificates, issued pursuant to § 13b-80, are exclusive in nature.

[5] General Statutes § 13b-4 provides in relevant part: "The commissioner shall have the following general powers, duties and responsibilities:

"(1) To coordinate and develop comprehensive, integrated transportation policy and planning to include a long-range master plan of transportation for the state;

"(2) To coordinate and assist in the development and operation of a modern, safe, efficient and energy-conserving system of highway, mass transit, marine and aviation facilities and services;

"(3) To promote the coordinated and efficient use of all available and future modes of transportation;

"(4) To study commuter and urban travel and in cooperation with federal, regional and local agencies and persons to formulate and implement plans and programs to improve such travel;

"(5) To study means of providing facilities for parking motor vehicles so as to encourage travel by the combination of motor vehicle and other modes of transportation and in cooperation with federal, regional and local agencies and persons to formulate and implement plans and programs for this purpose . . . ."

[6] General Statutes § 13b-32 provides: "Improvement in the transportation of people and goods within, to and from the state by rail, motor carrier or other mode of mass transportation on land is essential for the welfare of the citizens of the state and for the development of its resources, commerce and industry. The development and maintenance of a modern, efficient and adequate system of motor and rail facilities and services is required. The department shall assist in the development and improvement of such facilities and services and shall promote new and better means of mass transportation by land."

[7] Other definitions of "facility" in Merriam-Webster's Collegiate Dictionary, supra, are: (1) "the quality of being easily performed"; (2) "ease in performance: APTITUDE"; and (3) "readiness of compliance . . . ."

[8] I acknowledge the unpublished decision of the Tennessee Court of Appeals in *Lynnwood Utility Co.* v. *Franklin*, Docket No. 89-360-II, 1990 WL 38358, *3–4 (Tenn. App. April 6, 1990), cited by the majority, which held that a sewer utility's "Certificate of Convenience and Necessity" was not a " 'facility' " for purposes of allocating statutorily mandated damages when a municipality elected to provide water services in an area covered by that certificate, but where the utility had never provided services and had no physical plant. The court held that "the term 'facilities' as used in [the utility statute] means physical facilities, not a right to construct physical facilities and not a right to serve an area." Id., *3. In my view, *Lynnwood Utility Co.* is distinguishable from the statutory scheme at issue in this case. First, unlike § 13b-36 (a), the Tennessee statute at issue in *Lynnwood Utility Co.* specifically required the valuation of the " 'facilities' " by the " 'replacement cost' " method, which necessarily contemplates a physical asset. Id., *4. In contrast, a public utility's operating rights, such as a certificate issued pursuant to § 13b-80, would be valued as a " 'going concern,' " a term that "has sometimes been used broadly to encompass all those factors which contrib-

ute to the value of the enterprise apart from its physical assets." *Gray Line Bus Co.* v. *Greater Bridgeport Transit District*, supra, 188 Conn. 422; see also id., 428–29 (discussing distinction between compensation for taking of franchise itself, and compensation for effects of taking franchise).

With respect to other cases, I agree with the majority that the Mississippi Supreme Court's opinion in *Mississippi Power & Light Co.* v. *Clarksdale*, 288 So. 2d 9 (Miss. 1973), does not directly shed light on the question before us, namely, whether the ordinary meaning of the term "facilities" encompasses exclusive operating rights. The statute at issue in the Mississippi case also is distinguishable because it only uses the term "facilities," without accompaniment by other terms such as "land" or "equipment." Id., 11. Nevertheless, *Mississippi Power & Light Co.* does not altogether lack persuasive value, insofar as the Mississippi Supreme Court held that, to be constitutional, a statute authorizing the use of eminent domain to take "facilities" had to be construed to include both a utility's physical facilities *and* its operating rights, given the value of the franchise and the fact that, without taking those rights, the city could not lawfully use the utility's physical plant to provide electrical services. Id., 11–12; see also id., 12 ("[t]he condemnation of [the utility's] physical property would destroy its franchise rights"). In my view, *Mississippi Power & Light Co.* suggests that a utility's operating rights are a significant component of its value as a concern, and that an expansive reading of eminent domain statutes in a manner that acknowledges that value is appropriate. Further, *Mississippi Power & Light Co.* suggests the reasonableness of a statutory interpretation that deems the word "facilities" to include operating rights.

[9] Indeed, the majority in this case follows a variant of ejusdem generis, namely, the principle of noscitur a sociis, or that "the meaning of a particular word or phrase in a statute is ascertained by reference to those words or phrases with which it is associated." *Staples* v. *Palten*, 214 Conn. 195, 199, 571 A.2d 97 (1990). The majority applies this principle to observe that § 13b-36 (a) "groups the term 'facilities' with three other nouns describing what the commissioner may condemn, namely, 'land, buildings, [and] equipment,' and each refers to tangible objects." In my view, the Missouri Supreme Court's decision in *Mashak* v. *Poelker*, supra, 367 S.W.2d 630, more aptly demonstrates the breadth of the term "facilities," even when used in an apparently more restrictive context.

[10] I disagree with the majority's view of the certificates as falling beyond the scope of this very broad definition "because they do not merely 'promote the ease' of the plaintiffs' business but, in fact, authorize it in the first place." Specifically, I disagree with the factual premise of this position. Although the certificates are undoubtedly of great economic value to the plaintiffs' businesses, they do not authorize the plaintiffs' corporate existence as bus companies, and nowhere do the plaintiffs claim that the loss of the certificates will itself put them out of business as a matter of law.

[11] "While not specifically treated as a canon of statutory interpretation, Occam's razor is apropos here." *American Civil Liberties Union* v. *Clapper*, 804 F.3d 617, 624 n.2 (2d Cir. 2015). "[T]he principle of Occam's razor— that the simplest of competing theories should be preferred over more complex and subtle ones—is as valid juridically as it is scientifically." (Internal quotation marks omitted.) *Brodie* v. *Workers' Compensation Appeals Board*, 40 Cal. 4th 1313, 1328 n.10, 156 P.3d 1100, 57 Cal. Rptr. 3d 644 (2007); see also *Johnson* v. *Commonwealth*, 412 S.W.3d 157, 168 n.4 (Ky. 2013) (describing fourteenth century origin of Occam's razor, as logical " 'law of parsimony,' " in William of Ockham's " 'Commentary on the Sentences' ").

[12] I acknowledge the majority's reliance on the revocation provisions of § 13b-80 in support of its contention that the commissioner's "inability to condemn the certificates at issue does not render meaningless his takings power as applied to bus companies. He retains the power to suspend or revoke certificates for cause; see General Statutes § 13b-80; and his takings power supplement his power to suspend or revoke the certificates. If the commissioner should need to revoke a bus company's certificate for poor performance and choose to have the state or another company operate over certain bus routes, § 13b-36 (a) also permits him to take the bus company's tangible assets for use in continuing to provide bus service, albeit with a different operator." I believe the majority's reliance on the revocation provisions of § 13b-80 is inapposite because, under that section, no compensation would be due should there be a substantiated finding of, for example, poor bus service that would justify revocation for "cause." Here, the property right is being taken by eminent domain for the public use, for which no such cause is necessary—only the payment of just compensation for the taking.

[13] General Statutes § 13b-23 provides: "The commissioner shall have such additional powers, incidental to the express powers granted under this chapter and title 13a, as may be necessary or proper for the effective performance of his powers and duties."

[14] I agree with the majority that § 13b-23 does not, *by itself*, provide the requisite authority, via "express terms or clear implications"; *Northeastern Gas Transmission Co.* v. *Collins*, supra, 138 Conn. 592; to sustain the taking of the plaintiffs' certificates. Nevertheless, I believe that the legislature's grant of incidental powers to the commissioner in § 13b-23 counsels us to adopt an interpretation of the takings power under § 13b-36 (a) that is as broad as the statutory text will allow.

[15] General Statutes § 7-273e (a) provides in relevant part: "If the directors deem it necessary to preserve or to develop a transit system, the district may establish, operate and maintain a transit system within the district or between the district and any municipality contiguous with its service area with which it contracts to furnish transit service, and for this purpose may establish a new system, *or may acquire all or a portion of the property and franchises* of any company or companies operating a transit service in the district, including that portion of the property and franchises used for operation within the district and also that portion of the property and franchises which is used outside the district but which is integrated into the service provided in the district. . . ." (Emphasis added.)

[16] I similarly disagree with the majority's reliance on the use of the term "facilities" in General Statutes § 13b-56, which governs harbor improvement projects, for the proposition that the legislature understands the term "facilities" only to embrace tangible items such as a bridge. That statute is distinguishable because it uses the term "facilities and structures" to expand a list of authorized harbor improvement projects that include "berthing areas, channels to berthing areas, sea walls, piers, docks, navigation aids, bridges and other related facilities and structures . . . ." General Statutes § 13b-56.

[17] General Statutes § 7-273d provides in relevant part: "Upon written notice to the Department of Transportation, to the chief executive officer of a private transit system, and to the elected chief executive officer of each municipality composing the district, the district, by its board of directors, may assume all powers of the Department of Transportation to regulate and supervise the operation of any such transit system within the district, provided that such transit system would be subject to the supervision of the department except for this section. Upon assuming such supervision the district, by its board of directors, shall establish passenger fares and any other rates to be charged and shall establish service standards, may order abandonment of uneconomic routes and shall exercise all powers of regulation and supervision over such transit system as are conferred on the department by title 16, in the same manner and under the same standards as are established by said title 16. Any company, town, city, borough, corporation or person aggrieved by any order, authorization or decision of the board of directors, except an order, authorization or decision approving the taking of land, in any matter to which he or it was or ought to have been made a party, may appeal therefrom to the department within thirty days after the filing of such order, authorization or decision. . . . Where the department determines that the order, authorization or decision of the transit district would affect state-wide transportation policy adversely, such order, authorization or decision may be modified or overruled. . . ."

[18] General Statutes § 7-273e (b) provides: "In order to insure the continuance of adequate transit services when it appears that the holder of the franchise is or will be incapable of continuing to offer satisfactory service to meet present or future public passenger transportation requirements and it is improbable that such franchise will be sought by any other private concern, the Department of Transportation, on its own initiative, may or, on request of the transit district or the legislative body of one or more municipalities in the area served, shall fix a time and place for a hearing as to whether such franchise is suitable for acquisition by a transit district. Said department shall give written notice of such hearing to the board of selectmen of each town, or in the case of cities and boroughs to the chief executive of each, within the area not less than fourteen days prior to such hearing, and shall cause to be published twice, not more than fourteen nor less than seven days prior to such hearing, notice of such hearing in a newspaper or newspapers having a substantial circulation in each municipality within such area. Suitability of a franchise for acquisition by a transit district shall be determined from the following considerations: (1) That public convenience and necessity require the continuance of transit service

within the area, (2) that the present franchise holder is or will be incapable of continuing to offer satisfactory service, (3) that it is improbable that such franchise will be sought by a private concern and (4) that continuance of transit service may require the operation of such service by a transit district. After a public hearing thereon and consideration of the above-mentioned factors, the department may declare such franchise suitable for acquisition by a transit district, provided such declaration shall not affect the authority of the municipalities in the area to establish such a district. Ability to offer satisfactory service shall be based upon the financial stability of the franchise holder as determined from past, current and projected net income and from an estimate of financial ability to meet future public passenger transportation requirements in the area. The department may make periodic inspections of transit system franchise holders to determine the financial stability of each and for this purpose may examine the books, accounts and other pertinent documents of such franchise holders and shall have the power to compel the attendance of witnesses and the production of books, accounts and other pertinent documents by the issuance of a subpoena. With the written consent of the chief executive officer of each municipality within the area served, the district and the transit system franchise holder may execute an agreement to waive the holding of a hearing by the department, as described in this subsection and may exercise its power to acquire real property and interests and rights in real property in accordance with subsection (c) of this section." See also General Statutes § 7-273e (c) (setting forth procedure for taking of real property by transit district "subject to the prior approval of the legislative body or bodies of the municipality or municipalities in which the real property is located").

———————————————