RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0007p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

────────────────

DONALD HERB JOHNSON,

*Petitioner-Appellant,*

*v.*

No. 23-5330

LAURA PLAPPERT, Warden,

*Respondent-Appellee.*

────────────────

Appeal from the United States District Court for the Eastern District of Kentucky at Pikeville.
No. 7:14-cv-00117—Karen K. Caldwell, District Judge.

Argued: June 10, 2025

Decided and Filed: January 9, 2026

Before: BATCHELDER, MURPHY, and MATHIS, Circuit Judges.

────────────────

## COUNSEL

**ARGUED:** Dennis J. Burke, DEPARTMENT OF PUBLIC ADVOCACY, LaGrange, Kentucky, for Appellant. Christopher Henry, OFFICE OF THE SOLICITOR GENERAL, Frankfort, Kentucky, for Appellee. **ON BRIEF:** Dennis J. Burke, DEPARTMENT OF PUBLIC ADVOCACY, LaGrange, Kentucky, Jamesa J. Drake, DRAKE LAW LLC, Auburn, Maine, for Appellant. Christopher Henry, OFFICE OF THE SOLICITOR GENERAL, Frankfort, Kentucky, for Appellee.

MURPHY, J., delivered the opinion of the court in which BATCHELDER, J., concurred. MATHIS, J. (pp. 21–23), delivered a separate opinion concurring in part and concurring in the judgment.

———————————

**OPINION**

———————————

MURPHY, Circuit Judge.  Over 30 years ago, Donald Herb Johnson pleaded guilty to a brutal murder.  He now claims that a Kentucky trial court failed to ensure he entered a knowing plea because it did not ask him if he knew that he was waiving his privilege against self-incrimination and right to a jury.  He also claims that the trial court refused to consider all his mitigating evidence when sentencing him to death.  But the Kentucky Supreme Court rejected both claims on the merits.  To obtain habeas relief in federal court, then, Johnson must meet the demanding standards in the Antiterrorism and Effective Death Penalty Act (AEDPA).  He has not done so.  The Kentucky Supreme Court reasonably found that the record showed Johnson knew his rights.  And the Kentucky trial court considered all of Johnson's mitigating evidence; it just did not find that evidence persuasive.  So the district court rightly denied Johnson's habeas petition.  We affirm.

I

Helen Madden turned 61 in 1989.  For over a decade, she had held a job at the Bright 'N Clean Laundry in Hazard, Kentucky.  On November 29 of that year, Madden was working the second shift at the laundromat until its close at 10:00 p.m.  Near the end of her shift, Johnson entered and asked if he could make a phone call to find "a place to stay for the night."  Sent. Tr., Vol. VII, at 748.  Madden repeatedly allowed him to call his brother.  But Johnson kept getting a busy signal.  Madden eventually told him that he had to leave so that she could close up for the night. Johnson "lost it."  *Id.* at 750.  He beat, stabbed, sexually assaulted, and tortured Madden.  Her naked and disemboweled body had at least two dozen stab wounds.  After committing this murder, Johnson stole about $270 from the laundromat.  He used this cash to get some food and to party with a friend.

The next morning, a coworker discovered Madden's body in the laundromat.  Although this coworker had known Madden for years, she could not recognize her body.  Within a day, Kentucky police suspected Johnson of the murder.  They arrested him on December 1.

The Commonwealth charged Johnson with five crimes. After five years of preliminary proceedings, he decided to enter an unconditional guilty plea. The trial court held a plea hearing at which it questioned Johnson about this plea. After this colloquy, the court found that Johnson had knowingly and voluntarily pleaded guilty to murder, first-degree robbery, first-degree burglary, and two counts of first-degree sexual abuse.

Johnson's murder conviction rendered him eligible for the death penalty. The prosecution wanted a jury to decide whether to impose this punishment, but Johnson preferred a sentencing trial before a judge. *See Commonwealth v. Johnson*, 910 S.W.2d 229, 229 (Ky. 1995). The trial court found that Johnson could unilaterally forgo a jury trial during a capital case's sentencing phase over the prosecution's objection. *See id.* But the prosecution appealed this ruling. *See id.* The Kentucky Supreme Court disagreed with the trial court and held that the prosecution had a right to a jury under Kentucky law. *See id.* at 231.

On remand, Johnson tried to get out of his guilty plea. He claimed that he had pleaded guilty only because his counsel told him that this plea would ensure that a judge (not a jury) would sentence him for his brutal crime. The trial court denied this request, reasoning that Johnson had known that it might exercise its "discretion to empanel a jury" even under its mistaken view that the prosecution did not have a say in the matter. H'rg Tr., R.72-2, PageID 2130. Johnson's lawyers next moved to withdraw on the ground that they had given him bad advice. *See Johnson v. Commonwealth*, 412 S.W.3d 157, 159 (Ky. 2013). The court appointed a new attorney to represent Johnson. *See id.* This new attorney convinced the prosecution to permit a judge rather than a jury to sentence Johnson. *See id.*

The trial court thus held a bench trial to determine Johnson's punishment. Over several days in September 1997, the parties introduced many witnesses and exhibits. The court ultimately sentenced Johnson to death.

Johnson raised some 26 challenges in his direct appeal to the Kentucky Supreme Court. *See Johnson v. Commonwealth*, 103 S.W.3d 687, 690 (Ky. 2003). Among other things, he argued that he did not enter a knowing and voluntary plea because the trial court had not informed him at the plea hearing of various rights. *See id.* at 690–91. And he argued that the

trial court had failed to properly consider all his mitigation evidence.  *See id.* at 697.  The Kentucky Supreme Court rejected all his claims.  *See id.* at 691–98.  It affirmed his conviction and sentence.  *See id.* at 698.

Johnson spent the next three decades seeking collateral relief.  He first requested postconviction relief in state court.  Of most note, he argued that he had pleaded guilty only because he thought the trial court had entered an off-the-record agreement to spare his life.  *See Johnson v. Commonwealth*, 2008 WL 4270731, at *1–2 (Ky. Sept. 18, 2008).  The trial court rejected his postconviction motion, "emphatically" denying that it had made any such improper deal.  *See id.* at *1, *3.  But the Kentucky Supreme Court remanded this "secret deal" claim to the trial court and assigned a different judge to conduct an evidentiary hearing.  *See id.* at *3–4.

On remand, the new judge held a lengthy hearing.  *See Johnson*, 412 S.W.3d at 160.  Many witnesses disputed the events that led up to Johnson's plea.  *See id.* at 160–64.  The new judge ultimately found "no credible evidence" that anyone had promised Johnson that the court would sentence him to life if he pleaded guilty.  *Id.* at 164.  So the judge denied postconviction relief again.  *See id.*  This time, the Kentucky Supreme Court affirmed.  *See id.* at 164–70.

Out of state-court options, Johnson began his federal litigation.  He filed a petition in the district court under 28 U.S.C. § 2254.  The petition raised eight claims for relief.  *See Johnson v. White*, 2022 WL 3205865, at *18 (E.D. Ky. Aug. 8, 2022).  The district court rejected all eight.  *See id.* at *19–31.  It also declined to grant Johnson a certificate of appealability.  *See id.* at *32.

Johnson turned to us for such a certificate.  We allowed him to appeal two claims: (1) that he did not knowingly plead guilty and (2) that the trial court wrongly refused to consider all his mitigating evidence when sentencing him.  *See Johnson v. Plappert*, 2024 U.S. App. LEXIS 12355, at *4–5, *13–14 (6th Cir. May 22, 2024) (order).  We review the district court's rejection of these claims de novo.  *See Bergman v. Howard*, 54 F.4th 950, 956 (6th Cir. 2022).

## II. Knowing and Voluntary Plea

Johnson first challenges the Kentucky Supreme Court's rejection of his claim that he did not enter a knowing and voluntary plea.  This challenge falls short under AEDPA's standards.

A. Background

We start with the factual backdrop. After Johnson told the trial court that he sought to plead guilty, the court held a change-of-plea hearing. It asked Johnson many questions. At the outset, Johnson assured the court that he believed his counsel had adequately represented him, that he did not want to discuss his case with his attorneys any further, and that he was not under the influence of drugs or alcohol.

The court next sought to confirm that Johnson knew he would be "waiving certain rights guaranteed to [him] by the Constitution" if he pleaded guilty. Plea Tr., R.36-2, PageID 620. The court identified several of these rights, including "the right to a speedy and public trial," the right to have counsel "represent[]" him, "the right to require the Commonwealth to prove [his] guilt beyond a reasonable doubt," the right to confront witnesses, and the right to present evidence. *Id.*, PageID 620–21. Johnson acknowledged that he knew he had these rights and that he would voluntarily waive them by pleading guilty.

So the court switched to discussing the nature of the charges. Johnson recited by heart the potential penalties for each offense, including a possible "[d]eath sentence" for the murder conviction. *Id.*, PageID 622. He also agreed that the prosecution had not recommended a sentence in exchange for his plea. And he acknowledged that nobody had "induced, influenced, threatened, coerced or in any other manner subjected" him "to such influences" to get him to plead guilty. *Id.*, PageID 623–24.

Johnson proceeded to plead guilty to all five counts. At the end of this colloquy, the court accepted his plea. It found that Johnson had pleaded guilty "freely, knowingly, voluntarily and intelligently." *Id.*, PageID 627. It added that he was "aware of the nature of this proceeding and all matters contained in the record." *Id.*

In a direct appeal to the Kentucky Supreme Court, Johnson attacked his plea. He argued that he did not knowingly plead guilty because the trial court did not inform him of various rights that he would waive. *See Johnson*, 103 S.W.3d at 691. Johnson pointed to his privilege against self-incrimination, his right to appeal, his right to a jury, and his right to the presumption of innocence. *See id.* Over a dissent, the Kentucky Supreme Court disagreed with him. *Id.* at 691–

92. Citing *Boykin v. Alabama*, 395 U.S. 238 (1969), it reasoned that trial courts do not need to list each right and obtain an individual waiver for each one. *See Johnson*, 103 S.W.3d at 691. The court instead concluded that Johnson needed to have a "full understanding of what the plea connotes and its consequences." *Id.* (citation omitted). And the court found that the trial court's questions showed that Johnson knew "of the rights he was waiving." *Id.*

B. Merits

1. Legal Standards

Johnson renews his claim that he did not enter a knowing and voluntary plea. Because the Kentucky Supreme Court rejected this claim "on the merits," its decision triggers AEDPA. 28 U.S.C. § 2254(d)(1); *see Fitzpatrick v. Robinson*, 723 F.3d 624, 639 (6th Cir. 2013). Johnson thus may obtain relief only if the state court issued a "decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d)(1). The Supreme Court has regularly "reminded" us that Congress made this test "difficult to meet." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quoting *Metrish v. Lancaster*, 569 U.S. 351, 358 (2013)).

Prisoners must prove two things. *See Fields v. Jordan*, 86 F.4th 218, 231 (6th Cir. 2023) (en banc). They first must identify a "clearly established" legal principle. 28 U.S.C. § 2254(d)(1). To do so, prisoners must ground this principle in a Supreme Court holding. *See Fields*, 86 F.4th at 231–32. Neither Supreme Court dicta nor lower-court holdings suffice. *See id.*

Prisoners then must show that the state court's decision "was contrary to, or involved an unreasonable application of," the identified principle. 28 U.S.C. § 2254(d)(1). To unreasonably apply a principle, a state court must do more than make a debatable mistake. *See Hodge v. Plappert*, 136 F.4th 648, 661 (6th Cir. 2025) (en banc). Instead, its decision must be "so obviously wrong" that nobody could defend it in a "fairminded" way. *Shinn v. Kayer*, 592 U.S. 111, 118 (2020) (per curiam) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). Courts thus must deny relief whenever "any reasonable argument" could justify the state court's

decision.  *Davis v. Carpenter*, 798 F.3d 468, 474 (6th Cir. 2015) (quoting *Richter*, 562 U.S. at 105).

Applying this test, we must start by pinpointing the "clearly established" law that Johnson relies on.  28 U.S.C. § 2254(d)(1).  The Supreme Court has long held that defendants must enter "knowing and voluntary" guilty pleas.  *Puckett v. United States*, 556 U.S. 129, 136 (2009); *Parke v. Raley*, 506 U.S. 20, 28 (1992).  The Court has generally described the "standard" for a knowing and voluntary plea as "whether [it] represents a voluntary and intelligent choice among the alternative courses of action open to the defendant."  *North Carolina v. Alford*, 400 U.S. 25, 31 (1970).  To give a "knowing" (sometimes referred to as "intelligent") plea, a defendant must have "sufficient awareness of the relevant circumstances and likely consequences."  *Brady v. United States*, 397 U.S. 742, 748 (1970); *see Kercheval v. United States*, 274 U.S. 220, 223–24 (1927).  To give a "voluntary" plea, the defendant must decide to plead guilty free from coercion and fraud.  *See Brady*, 397 U.S. at 750; *see also McMann v. Richardson*, 397 U.S. 759, 766 (1970).

Johnson relies on the "knowing" element.  This element requires defendants to understand the nature of the charged crime, including its required legal elements.  *See Bradshaw v. Stumpf*, 545 U.S. 175, 183 (2005); *Henderson v. Morgan*, 426 U.S. 637, 644–46 & n.13 (1976); *see also Bousley v. United States*, 523 U.S. 614, 618–19 (1998).  It also requires them to know that they will waive trial-related constitutional rights by pleading guilty.  *See Godinez v. Moran*, 509 U.S. 389, 400–01 (1993).  Among other things, those who plead guilty give up the "privilege against compulsory self-incrimination" (because they admit their guilt), the "right to trial by jury" (because they forgo a trial), and the "right to confront [their] accusers" (because the prosecution need not present witnesses).  *McCarthy v. United States*, 394 U.S. 459, 466 (1969).  And the Constitution generally requires "an intentional relinquishment or abandonment of a known right" before courts will enforce a waiver of the right.  *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).

That said, defendants need not possess "complete knowledge of the relevant circumstances" before courts may accept their plea.  *United States v. Ruiz*, 536 U.S. 622, 629–30 (2002); *see also Iowa v. Tovar*, 541 U.S. 77, 92 (2004).  For example, the Supreme Court has

held that defendants need not know how the rights that they are waiving will apply to their case's "*specific*" facts. *Ruiz*, 536 U.S. at 629. Rather, they need only have a "*general*" understanding of those rights. *Id.* Likewise, defendants can give knowing pleas even if they have some "misapprehension" about their case. *Id.* at 630. So the Court has held that a defendant gave a knowing plea even when he mistakenly believed that he could get the death penalty under a statute later found unconstitutional. *See Brady*, 397 U.S. at 757. It has also held that a defendant can give a knowing plea even when the defendant "mistakenly assessed" whether a court would permit the prosecution to introduce an allegedly coerced confession. *See McMann*, 397 U.S. at 769. And it has said that a defendant can give a knowing plea even when the defendant did not know of some constitutional defense (such as a double-jeopardy defense). *See United States v. Broce*, 488 U.S. 563, 571–73 (1989); *Tollett v. Henderson*, 411 U.S. 258, 267 (1973).

Apart from these longstanding *substantive* standards for a knowing and voluntary plea, the Supreme Court in *Boykin* also adopted a "new" *procedural* "element" to protect this constitutional guarantee: that "the record must affirmatively" show the plea's knowing and voluntary nature. *Brady*, 397 U.S. at 747 n.4. The defendant in *Boykin* pleaded guilty to five counts of armed robbery without the standard plea colloquy common today. *See* 395 U.S. at 239. The court "asked" the defendant "no questions," and he "did not address the court." *Id.* After a sentencing trial, a jury imposed a death sentence. *Id.* at 240. A state court upheld the plea over a dissent that found the record "inadequate" to decide whether the defendant knowingly and voluntarily entered it. *Id.* The Supreme Court reversed. *Id.* at 242–44. According to the Court, the record in a criminal case must "affirmative[ly]" establish that a defendant entered a knowing and voluntary guilty plea. *Id.* at 242. To create that rule, the Court stressed that defendants waive three constitutional rights when pleading guilty: "the privilege against compulsory self-incrimination," "the right to trial by jury," and "the right to confront one's accusers." *Id.* And the Court refused to "presume" a knowing and voluntary "waiver" of these rights "from a silent record." *Id.* at 243.

So what did *Boykin* "clearly establish[]" under AEDPA? 28 U.S.C. § 2254(d)(1). As Judge Leval has explained, the Court's "meandering opinion" makes it "nearly impossible to discern what question was in dispute and what was the holding." Pierre N. Leval, *Judging*

*Under the Constitution: Dicta about Dicta*, 81 N.Y.U. L. Rev. 1249, 1269, 1271 (2006). The decision leaves many unanswered questions about what the record must contain to show a knowing and voluntary plea. Why, for example, did the court identify three specific trial rights (such as the right to a jury and to confront witnesses) but ignore several others (such as the right to compulsory process or to a public trial)? *Id.* Did it mean to single out the three rights for special treatment? Or did it just use them as examples? Similarly, must a trial court specifically identify each trial-related right and get a separate waiver for each one? Or can the record suffice if it shows more generally that a defendant knew that a guilty plea would waive a trial (and the various rights that go with it)? Likewise, must courts limit themselves to the plea colloquy when deciding whether a defendant entered a knowing and voluntary plea? Or can they look at other evidence in the record?

After *Boykin*, courts have answered at least some of these questions. To start, lower-court precedent shows that *Boykin* did not "clearly establish[]" any rule requiring trial courts to specifically warn defendants that they will waive the three rights it mentioned. 28 U.S.C. § 2254(d)(1). Indeed, most courts have read *Boykin* not to adopt this requirement *at all*—let alone *clearly* so. *See Green v. State*, 898 S.E.2d 500, 508–15 (Ga. 2024) (collecting cases); 5 Wayne R. LaFave et al., Crim. Proc. § 21.4(e) (4th ed.) Westlaw (database updated Nov. 2024) (same). We, for example, have held that *Boykin* does not compel courts to tick through these three rights during a plea colloquy and obtain "separate waivers as to each." *Fontaine v. United States*, 526 F.2d 514, 516 (6th Cir. 1975). Many other circuits agree. *See, e.g.*, *United States v. Stewart*, 977 F.2d 81, 84–85 (3d Cir. 1992); *McChesney v. Henderson*, 482 F.2d 1101, 1110 (5th Cir. 1973); *United States v. Henry*, 933 F.2d 553, 559–60 (7th Cir. 1991); *Wilkins v. Erickson*, 505 F.2d 761, 763 (9th Cir. 1974); *Stinson v. Turner*, 473 F.2d 913, 915–16 (10th Cir. 1973).

Next, courts have not limited themselves to a judge's plea colloquy to resolve whether the judge made the "affirmative showing" of a knowing and voluntary plea that *Boykin* requires. 395 U.S. at 242. Courts instead have looked to the "totality of the circumstances" in the record. *Henry*, 933 F.2d at 560; *see Brady*, 397 U.S. at 749. So the Supreme Court has held that the record might suffice if it shows that defense counsel conveyed the necessary information to a defendant. *See Bradshaw*, 545 U.S. at 183; *see also Pitts v. United States*, 763 F.2d 197, 200

(6th Cir. 1985) (per curiam). And seemingly contrary to *Boykin*, the Court has suggested that it may sometimes "be appropriate to *presume*" that defense counsel explained the nature of the charges to a client. *Marshall v. Lonberger*, 459 U.S. 422, 436 (1983) (emphasis added) (quoting *Henderson*, 426 U.S. at 647). It has also relied on the defendant's "experience in the criminal justice system" when evaluating the record's adequacy. *Id.* at 437; *see Stewart*, 977 F.2d at 85.

Still, the caselaw leaves some uncertainty over what a record must contain to show a knowing plea when a judge's plea colloquy overlooks one of the three *Boykin* rights. Suppose that the court fails to alert a defendant of the "privilege against compulsory self-incrimination." *United States v. Frontero*, 452 F.2d 406, 415 (5th Cir. 1971). Must other parts of the record reveal that the defendant knew of this right and intentionally waived it when pleading guilty?

Courts appear split on the answer. On the one hand, some cases suggest that the record need not affirmatively show that defendants know of every *specific* trial right that they waive when pleading guilty. *See, e.g.*, *Henry*, 933 F.2d at 559–60; *Neyland v. Blackburn*, 785 F.2d 1283, 1287–88 (5th Cir. 1986); *Stinson*, 473 F.2d at 915–16. If the record instead shows a defendant's "awareness" of the general "'consequences' of a guilty plea" (such as their waiver of a trial), these cases will uphold the plea. *Frontero*, 452 F.2d at 415; *see Henry*, 933 F.2d at 559. They justify this narrow reading of *Boykin* by highlighting its egregiously uncommon facts: the court there had asked the defendant no questions and so made "absolutely no showing" that the defendant knowingly pleaded guilty. *Frontero*, 452 F.2d at 415; *see United States v. Stead*, 746 F.2d 355, 356–57 (6th Cir. 1984). On the other hand, some cases suggest that the record must establish that defendants know of the three rights that *Boykin* mentioned. *See Pitts*, 763 F.2d at 200; *Ponce v. State*, 9 N.E.3d 1265, 1270 (Ind. 2014); LaFave, *supra*, § 21.4(e) & n.194. If the record does not show the defendant's specific awareness of these rights, these cases will remand for an evidentiary hearing to determine whether the defendant learned of the rights in other ways. *See Pitts*, 763 F.2d at 200. They justify this broader reading of *Boykin* on the ground that the Court reviewed a "state court conviction" and so must have adopted a federal "constitutional" rule. *Id.* at 199–200.

All told, *Boykin* "clearly established" a general rule: the record must "affirmatively disclose" that the defendant entered a knowing and voluntary plea. 28 U.S.C. § 2254(d)(1);

*Brady*, 397 U.S. 747 & n.4.  But the Court has yet to clarify the precise contours of this rule or the way it should apply in some circumstances.  Under AEDPA, then, state courts have "more leeway" to take different views of what *Boykin* requires.  *Richter*, 562 U.S. at 101 (citation omitted).

2. Application

Despite this leeway, Johnson argues that the Kentucky Supreme Court unreasonably applied *Boykin* because the record lacks an "affirmative showing" that he knew of two of the three rights that *Boykin* mentioned: his privilege against self-incrimination and his right to a jury. 395 U.S. at 242.  To his credit, Johnson concedes that *Boykin* did not require the trial court to expressly mention these rights and obtain a separate waiver for each.  Appellant's Br. 26, 38.  But he says that the Kentucky Supreme Court should have ordered an evidentiary hearing because the record lacks evidence that Johnson even knew the general "*concepts* of the right to trial by jury or the privilege against self-incrimination[.]"  *Id.* at 38.  For two reasons, though, the Kentucky Supreme Court reasonably applied *Boykin*'s general rule under AEDPA.

*Reason One*: The Kentucky Supreme Court reasonably took the side of those courts that have narrowly read *Boykin* to require only an affirmative showing that the defendant *generally* knew the consequences of pleading guilty—not that the defendant *specifically* knew of every trial right.  *See Henry*, 933 F.2d at 559–60; *Neyland*, 785 F.2d at 1287–88; *Stinson*, 473 F.2d at 915–16.  Indeed, the Kentucky Supreme Court's opinion reads like these many other decisions. The court conceded that the trial court did not identify the privilege against "compulsory self-incrimination" and the "right to a jury" during its colloquy.  *Johnson*, 103 S.W.3d at 691; *cf. Frontero*, 452 F.2d at 415.  But it held that *Boykin* did not require "a separate enumeration of rights waived and separate waivers as to each."  *Johnson*, 103 S.W.3d at 691; *cf. Henry*, 933 F.2d at 559.

Next, the Kentucky Supreme Court reasonably found that Johnson had a sufficient understanding of the general "circumstances and consequences" based on the "twenty questions" that the trial court asked him.  *Johnson*, 103 S.W.3d at 691; *cf. Neyland*, 785 F.2d at 1287–88. Among other things, the court ensured that Johnson was not on drugs or alcohol and could

understand the proceedings. Plea Tr., R.36-2, PageID 618–19. It also ensured that Johnson knew the nature of the charges (including the possibility of a death sentence) and that nobody had coerced him into pleading guilty. *Id.*, PageID 621–24. Even more relevant, it ensured that Johnson knew he would "be waiving certain rights guaranteed to [him] by the Constitution" if he pleaded guilty. *Id.*, PageID 620. It mentioned the "right to a speedy and public trial," the right to an attorney, the burden on the prosecution to prove its case "beyond a reasonable doubt," the right to confront witnesses, and the right to present evidence. *Id.*, PageID 620–21. And while the court did not use "the word 'jury'" or "refer to the privilege against self-incrimination," this caselaw does not require these references to find that a defendant gave a knowing plea. *Neyland*, 785 F.2d at 1288. Johnson no doubt knew he was forgoing a trial (and all the rights that accompany it).

To be sure, perhaps the Kentucky Supreme Court (and these other courts) misread *Boykin*. And perhaps the Supreme Court will one day hold that *Boykin* requires an "affirmative showing" that a defendant knew of every *specific* criminal right listed in the Fifth and Sixth Amendments. 395 U.S. at 242. "But 'perhaps not.'" *Virginia v. LeBlanc*, 582 U.S. 91, 95 (2017) (per curiam) (quoting *Woodall*, 572 U.S. at 427). For our purposes, this question's debatable nature—as evidenced by the many cases that resemble the Kentucky Supreme Court's decision—forecloses relief under AEDPA. *See Carey v. Musladin*, 549 U.S. 70, 76–77 (2006); *Fields*, 86 F.4th at 237.

*Reason Two*: Even accepting Johnson's broader view of *Boykin*, the Kentucky Supreme Court could have reasonably held that the record affirmatively showed he knew of the specific right to a jury and the privilege against self-incrimination when he pleaded guilty. *See White v. Plappert*, 131 F.4th 465, 477 (6th Cir. 2025). That conclusion, too, dooms his claim. *See id.*

As a general matter, Johnson pleaded guilty in 1994—almost five years after the Commonwealth had charged him with the offenses in his indictment. And the record shows that Johnson actively participated in his defense. For example, his defense attorneys told the trial court that he took "quite an interest in the legal pleadings" before he pleaded guilty. H'rg Tr., R.72-2, PageID 2121. When accepting Johnson's plea, then, the trial court found as a fact that he was "aware of the nature of this proceeding and all matters contained in the record." Plea Tr.,

R.36-2, PageID 627.  This voluminous record stands in sharp contrast to *Boykin*'s bare record in which the defendant pleaded guilty at his arraignment.  395 U.S. at 239; *cf. Wilkins*, 505 F.2d at 764.

As a specific matter, the record contains an "affirmative showing" that Johnson knew of the two rights that he now raises.  *Boykin*, 395 U.S. at 242.  Start with Johnson's right to a jury. If the record reveals anything, it reveals that Johnson knew of—and *emphatically sought to waive*—this right.  As the Kentucky Supreme Court explained, Johnson engaged in an "unswerving trial strategy": "adamant avoidance of a jury trial and a jury sentencing recommendation."  *Johnson*, 103 S.W.3d at 692.  Why take this strategy?  The "excessively gruesome nature of the murder" rendered it highly likely that a jury would impose the death penalty.  *Id.*  Indeed, his lawyer later told the state court that Johnson pleaded guilty because he "knew" that "photos and videotape" of the crime scene would "come in before a jury."  H'rg Tr., R.72-2, PageID 2122.  Johnson even moved to withdraw his guilty plea when the Kentucky Supreme Court held that the prosecution had a right to have a jury trial at sentencing.  In that motion, his lawyers disclosed that Johnson had pleaded guilty because they had recommended that he "would stand a better chance before a judge who personally is familiar with gruesome crimes than before a jury[.]"  Mot., R.36-2, PageID 659.  They also told the court that Johnson had read "the history in Kentucky of the jury vers[u]s non-jury in death penalty cases."  H'rg Tr., R.72-2, PageID 2122.  Yet we are supposed to believe that he might not have known he had a right to a jury?  No, the record leaves no doubt that he knew he had such a right and saw its waiver as the "desirable course."  *Boykin*, 395 U.S. at 239.

Turn to Johnson's privilege against self-incrimination.  The record reveals that he learned of this right at the outset because the arresting officers told him that he had a right to remain silent when fulfilling their obligations under *Miranda v. Arizona*, 384 U.S. 436 (1966).  During pretrial proceedings, his lawyer also bluntly told the court that "Johnson [was] not going to testify" and that he would be "crazy" to do so given the "corroborating evidence" of his guilt. Hr'g Tr., R.72-3, PageID 2219.  His counsel later filed a notice clarifying that Johnson invoked his privilege against self-incrimination and would "not speak with any person outside the presence of his attorneys or their representatives[.]"  Notice, R.72-5, PageID 2297.

In response, Johnson nitpicks this analysis. He says that his attorney's statements about seeking to avoid a jury trial concerned only the *sentencing* phase—not the *guilt* phase. And he says that just because he knew he had a right to remain silent when speaking to *police* does not necessarily mean he knew he had a right to remain silent at *trial*. But these points fall short under our standard of review. They do nothing to show that a contrary conclusion would be "so obviously wrong" that every "fairminded" jurist would have to disagree with it. *Shinn*, 592 U.S. at 118 (quoting *Richter*, 562 U.S. at 103). We thus cannot grant relief under AEDPA.

In sum, Johnson's claim fails because the Kentucky Supreme Court reasonably took a narrow view of the items that *Boykin* requires trial courts to put on the record. And his claim alternatively fails because—even under a broader view of *Boykin*—the Kentucky Supreme Court could have reasonably concluded that the record affirmatively showed Johnson's knowledge of his right to a jury and privilege against self-incrimination.

## III. Mitigation Evidence

Johnson next argues that the trial court's statements at the sentencing hearing show that the court disregarded some of his evidence in mitigation. This challenge fares no better.

### A. Background

At his sentencing hearing, Johnson presented a lot of mitigating evidence. Johnson, his mother, and his siblings all testified in his defense. He also introduced a clinical psychologist as his defense expert.

Johnson used this evidence to prove six mitigating factors. He had no significant criminal history. He was only 22 years old when he murdered Madden. He had limited educational opportunities. And he murdered Madden while "under the influence of extreme mental or emotional disturbance[.]" Sent. Tr., R.72-1, PageID 2086.

Of more significance, Johnson also had an "abusive childhood." *Id.* Even the prosecution's expert called his "hideous upbringing" "about as bad as you can expect here in America." *Id.*, PageID 2047. Among other things, Johnson's father sexually abused him for years. His father and his father's friends would anally rape him. And his father regularly forced

him to engage in oral sex. Apart from this sexual abuse, Johnson's father beat him every week and sometimes left him bruised and bloodied. His father also introduced him to alcohol and drugs at a young age. His mother found his father so intolerable that she abandoned Johnson when he was just 11 years old. While growing up, Johnson also lived in 30 places across 16 States and attended 30 schools. His horrible childhood led him to attempt suicide several times.

Equally significant, Johnson suffered from various mental illnesses at the time of the crime. Johnson's expert diagnosed him with "Latent Schizophrenia," "Polysubstance Abuse," "Attention Deficit Disorder," "Mixed Development Disorder," and "Explosive Personality Disorder." Sent. Tr., Vol. VI, at 636. In plain English, the expert opined that Johnson had "major psychological problems" because of "one of the most dysfunctional family backgrounds" that the expert had ever seen. *Id.* So Johnson had a lot of "anger and hostility" from his "horrendous family and developmental background[.]" *Id.* at 639.

Despite this substantial mitigation, the trial court still imposed a death sentence. Its decision rested on "a review of the entire record" and "all the evidence." Sent. Tr., R.72-1, PageID 2084. That review included "evidence offered in aggravation and in mitigation of" the offense. *Id.*, PageID 2087. The court highlighted Johnson's mitigating factors and added that it had also "considered those aspects of [his] character" that he had used in mitigation. *Id.* But it found that the prosecution had proved two aggravating circumstances: that Johnson had committed the murder while engaged in both a robbery and a burglary. And it believed that these circumstances warranted capital punishment.

The court explained its reasoning in more detail at a formal sentencing hearing a month later. The court had no doubt that Johnson had "a bad upbringing" and highlighted his expert's mental-illness diagnoses. Sent. Tr., R.36-2, PageID 686–87. The court next discussed Johnson's own testimony. Johnson had testified that Madden talked to him like his mother would. Yet his mother was the only one who "ever gave [him] any affection," so the court found it troubling that he "lost it" after speaking with Madden. *Id.*, PageID 687. It next criticized Johnson for his conduct after the murder, including buying "cheeseburgers and fries" and having "a great time" partying with a friend. *Id.*, PageID 687–88. And although the evidence suggested that Johnson had "heard voices" while growing up, the court saw "no evidence" that he hallucinated during

the murder. *Id.*, PageID 688. The court also faulted Johnson for trying to blame everyone but himself. It, for example, noted how Johnson put "blame" on his "dad," which it might have understood if he had "killed [his] dad[.]" *Id.* But he did not. It added: "God help us as a society if it gets to the point that [Johnson] can blame everybody else and justify not facing the maximum penalty for committing an act like [he] did." *Id.* Apart from the mitigating evidence, the court noted that Johnson "did in fact brutalize" Madden. *Id.* While the crime's brutality alone did not justify the death penalty, the court relied on Johnson's "other actions" for that sentence. It concluded: "No one deserves to die" for refusing to allow a stranger to "use the telephone." *Id.*, PageID 688–89.

On appeal, Johnson claimed that the trial court's rationale for sentencing him to death showed that it did not consider all his mitigating evidence. *Johnson*, 103 S.W.3d at 697. The Kentucky Supreme Court held that this claim "lack[ed] merit" in a single unreasoned sentence. *Id.*

## B. Merits

Johnson renews his argument that the trial court did not "consider and give meaningful effect to all of the relevant mitigating evidence" in violation of the Eighth and Fourteenth Amendments. Appellant's Br. 59. Although the Kentucky Supreme Court did not give reasons for denying this claim, its rejection still qualifies as a decision "on the merits" that triggers AEDPA's deferential standards. 28 U.S.C. § 2254(d)(1); *see Richter*, 562 U.S. at 98. Still, Johnson asks us to "look through" the Kentucky Supreme Court's "unexplained" conclusion and assume that it adopted *only* the logic of "the trial court's sentencing decision" when it upheld that decision. Appellant's Br. 53 (quoting *Wilson v. Sellers*, 584 U.S. 122, 125 (2018)). Yet our caselaw teaches that we must use a "holistic, deferential standard" that considers not just a state court's reasoning but also any other reasoning that could have supported the state court's decision. *White*, 131 F.4th at 477. In all events, this issue does not affect the outcome here because the state trial court's own logic reasonably applied the governing constitutional standards.

The Eighth Amendment prohibits the States from inflicting "cruel and unusual punishments" on convicted criminals. U.S. Const. amend. VIII. And the Fourteenth Amendment prohibits the States from depriving defendants of their "life" without granting them "due process of law[.]" U.S. Const. amend. XIV, § 1. The Supreme Court has read these two provisions as giving capital defendants the right to present "all relevant mitigating evidence" at their trial's sentencing phase. *Eddings v. Oklahoma*, 455 U.S. 104, 117 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604–05, 608 (1978) (plurality opinion); *see Fields*, 86 F.4th at 249. So a plurality in *Lockett* found that a law violated the Constitution when it allowed the sentencer to consider only three potential mitigating circumstances. 438 U.S. at 607–08. And a majority in *Eddings* held that a sentencing court violated the Constitution when it refused to consider the defendant's abusive childhood as a mitigating factor on the ground that the law barred it from doing so. 455 U.S. at 112–16.

At the same time, *Eddings* and *Lockett* establish a narrow rule. The cases hold only that a sentencer may not—"*as a matter of law*"—refuse to consider relevant mitigating evidence. *Id.* at 114. They do not hold that the sentencer must give this mitigating evidence any specific weight when balancing it against the aggravating circumstances to determine the propriety of a death sentence. Rather, a sentencer remains free to find the evidence "unpersuasive" even after *Eddings* and *Lockett*. *Thornell v. Jones*, 602 U.S. 154, 165 (2024). The contrary rule—requiring a sentencing court to find mitigating evidence persuasive enough to justify a life sentence— would abolish capital punishment in all but name.

The state trial court's comments in this case show that its decision fell on the right side of this divide. To start, the court left no doubt that it had "considered all th[e] evidence before passing sentence." *Parker v. Dugger*, 498 U.S. 308, 314 (1991). It explained at the outset that its decision resulted from "a review" of "all the evidence"—not just some of it. Sent. Tr., R.72-1, PageID 2084. It also expressly identified the six mitigating factors on which Johnson relied. *Id.*, PageID 2086. And it said it considered all the credible evidence that Johnson had offered "in mitigation of the penalty[.]" *Id.*, PageID 2087. Just before announcing the verdict, it again reaffirmed that it had "*considered* the evidence in its entirety, including evidence offered in aggravation and in mitigation of [the] penalty[.]" *Id.* (emphasis added).

Next, the court's justification for a death sentence shows that it found Johnson's mitigating evidence "unpersuasive" after considering it in full. *Thornell*, 602 U.S. at 165. Although the court acknowledged Johnson's abusive childhood and mental-health struggles, it did not believe that these mitigating factors warranted "mercy" when balanced against the aggravating circumstances. *Kansas v. Carr*, 577 U.S. 108, 119 (2016). Among other reasons, Johnson failed to show that his mental-health struggles (in particular, his hearing "voices") played any part in the crime. Sent. Tr., R.36-2, PageID 688. And nothing that Madden said resembled his father's abusive conduct or should have triggered his "Explosive Personality" disorder. *Id.*, PageID 687. Madden instead talked to Johnson like his mother. On the other hand, Johnson could not have committed a more horrific murder: he left a naked, tortured, and disemboweled woman on the floor and callously partied with stolen money. In short, the trial court did not broadly refrain from using Johnson's mitigating evidence as "part of the sentencing decision at all." *Johnson v. Texas*, 509 U.S. 350, 361 (1993) (citation omitted). It narrowly held that this evidence deserved little "weight" in the analysis. *Eddings*, 455 U.S. at 115. *Eddings* and *Lockett* permit that conclusion.

Johnson's contrary arguments lack merit. He first suggests that his explosive-personality disorder might explain the murder because Madden resembled his mother—who abandoned him at a young age. Johnson thus theorizes that he might have acted with "rage" against his mother when he murdered the victim. Appellant's Br. 63. And he criticizes the state trial court for overlooking this possibility when it highlighted Johnson's other testimony that his mother was the only one who had showed him affection growing up. But this argument does nothing to suggest that the trial court failed to "consider" Johnson's evidence about his childhood. *Eddings*, 455 U.S. at 114. To the contrary, the argument shows that the court did consider the evidence and found it "unpersuasive." *Thornell*, 602 U.S. at 165. Although Johnson claims that its reasoning "does not make any sense," he disregards our limited role in these proceedings. Appellant's Br. 64. It is not our job to reweigh the aggravating and mitigating circumstances. To the contrary, the state trial court's objective consideration of Johnson's "bad upbringing" ends the matter as far as the Constitution is concerned. Sent. Tr., R.36-2, PageID 686.

Johnson next criticizes the state trial court's statements about his father's abuse and his mental-health struggles. The court suggested that his father's abuse did not adequately explain the crime because Johnson murdered a stranger—not his father. And it suggested that his mental-health struggles did not adequately explain the crime because "no evidence" suggested that he was hallucinating when he committed the murder. Sent. Tr., R.36-2, PageID 688. According to Johnson, these statements show that the court refused to consider his father's abuse or his mental-health struggles in mitigation. Yet Johnson mistakes a decision to find his evidence "*unpersuasive*" for a decision not to consider that evidence *at all*. *Thornell*, 602 U.S. at 165 (emphasis added). The trial court lawfully gave this mitigating evidence little "weight" because of Johnson's failure to prove a factual "link" between these mitigators and his crime. *Id.* at 166–67. As we have explained, courts may find mitigating evidence less persuasive when it "lacks a nexus with the crime of conviction." *White*, 131 F.4th at 483. That rule dooms this claim.

Lastly, Johnson claims that the state trial court did not consider various pieces of mitigating evidence (such as his young age and lack of substantial criminal history) because it imposed its sentence "without discussing" these mitigators. Appellant's Br. 67–68. We see two problems with this claim. For starters, *Lockett* requires a court to "*consider*" the defendant's mitigating evidence—not to *discuss* it when imposing a sentence. *Eddings*, 455 U.S. at 114 (emphasis added). Just as the Constitution does not impose "mandatory opinion-writing standards on state courts," so too it does not impose mandatory oral-pronouncement standards on them. *White*, 131 F.4th at 477. Besides, the state trial court did *expressly* mention Johnson's six "mitigating circumstances" when imposing a death sentence. Sent. Tr., R.72-1, PageID 2085–86. Its analysis thus shows that it considered Johnson's mitigation evidence. The Supreme Court's cases require nothing more.

\* \* \*

Apart from the two issues that we have decided, Johnson asks us to address two other issues for which we refused to grant a certificate of appealability. He argues that he did not enter a knowing and voluntary plea because he believed that the trial court had promised to impose a life sentence (despite the trial court's contrary factual findings). And he argues that his counsel

provided ineffective assistance because they overlooked mitigating evidence (despite the robust case in mitigation that they presented).

We again refuse to consider these issues. Indeed, we recently held that a merits panel does not have the "authority" to expand a certificate of appealability beyond the identified questions. *Randolph v. Macauley*, 155 F.4th 859, 866 (6th Cir. 2025). And while this limit does not restrict our jurisdiction, courts must enforce the limit when the "opposing party" has "invoked" it. *Id.* at 867. The warden invokes it here.

We affirm.

_____

**CONCURRENCE**

_____

MATHIS, Circuit Judge, concurring in part and concurring in the judgment. I agree with the majority opinion that the district court did not err in denying habeas relief to Donald Johnson. But because I question whether the Kentucky Supreme Court unreasonably applied *Boykin v. Alabama*, 395 U.S. 238 (1969),[1] when resolving Johnson's claim that his guilty plea was not knowing and voluntary, I would resolve that claim under the harmless-error test from *Brecht v. Abrahamson*, 507 U.S. 619 (1993). As the Supreme Court has explained, if this "court determines that a habeas petition fails because of *Brecht*, there is no need to prolong the matter by formally applying AEDPA as well." *Brown v. Davenport*, 596 U.S. 118, 138–39 (2022) (citation modified).

In *Brecht*, the Supreme Court held "that the *Kotteakos* [*v. United States*, 328 U.S. 750 (1946)] harmless-error standard applies" when determining whether to grant habeas relief due to constitutional errors. 507 U.S. at 638. "The test under *Kotteakos* is whether the error 'had substantial and injurious effect or influence'" on a jury's verdict or a guilty plea. *Id.* at 637 (quoting *Kotteakos*, 328 U.S. at 776); *Griffin v. United States*, 330 F.3d 733, 736 (6th Cir. 2003). In other words, did the error "result[] in actual prejudice" to the habeas petitioner? *Brecht*, 507 U.S. at 637 (citation modified). The burden falls on the petitioner to show prejudice. *Davenport*, 596 U.S. at 140. We may "consider the whole body of law—including lower-court cases"—and the entire record "to determine whether an error was prejudicial." *Chandler v. Brown*, 137 F.4th 525, 547–48 (6th Cir. 2025) (per curiam) (quotation omitted).

_____

[1]In *Boykin v. Alabama*, the Supreme Court held that it is unconstitutional for a trial judge to accept a defendant's "guilty plea without an affirmative showing that it was intelligent and voluntary." 395 U.S. 238, 242 (1969); *id.* at 244–45 (Harlan, J., dissenting). To satisfy the affirmative-showing requirement, the record must indicate, at a minimum, that the defendant has waived his Fifth Amendment right against self-incrimination and his Sixth Amendment rights to a jury trial and to confront adverse witnesses. *Id.* at 243 (majority opinion); *id.* at 245 (Harlan, J., dissenting).

*Brecht*'s harmless-error analysis applies to all "non-structural" constitutional errors on collateral review. *O'Neal v. Balcarcel*, 933 F.3d 618, 625 (6th Cir. 2019) (quotation omitted). Under our precedent, the acceptance of an unknowing or involuntary guilty plea is not a structural error. *See Ruelas v. Wolfenbarger*, 580 F.3d 403, 410–11 (6th Cir. 2009); *United States v. Hall*, No. 19-5531, 2019 WL 12337896, at *2 (6th Cir. Dec. 19, 2019) (order); *cf. Greer v. United States*, 593 U.S. 503, 513–14 (2021) ("the omission of a required warning" during a plea colloquy is not a structural error because it "does not deprive defendants of basic protections without which a criminal proceeding cannot reliably serve its function as a vehicle for determination of guilt or innocence" (citation modified)). As a result, assuming the state court erred in accepting Johnson's guilty plea, this court can grant habeas relief only if "grave doubt" exists about whether the error affected the outcome. *Davenport*, 596 U.S. at 135–36; *see also Riselay v. United States*, No. 96-1310, 1996 WL 694145, at *1 (6th Cir. Dec. 3, 1996) (order) (framing the question under *Brecht* as whether "the record . . . reflect[s] an error of constitutional magnitude which had a substantial and injurious effect or influence on the petitioner's plea").

Johnson has failed to carry his burden under *Brecht*. Johnson provides no evidence or argument that the trial court's failure to address his right to a jury trial and to be free from self-incrimination during the plea colloquy had a substantial and injurious effect on his decision to plead guilty. *See Brecht*, 507 U.S. at 637 (quotation omitted). As the Kentucky Supreme Court noted, Johnson's "unswerving trial strategy involved adamant avoidance of a jury trial and a jury sentencing recommendation" "[g]iven the excessively gruesome nature of the murder, which entailed torture and mutilation of an elderly victim." *Johnson v. Commonwealth*, 103 S.W.3d 687, 692 (Ky. 2003).

Indeed, before Johnson pleaded guilty, his attorney noted that "Johnson would be crazy to testify at a trial where you've got [no] corroborating evidence." R. 72-3, PageID 2219. And after he pleaded guilty, Johnson's attorney explained that his client did so because "[h]e wanted to get on with it and get it over with," and that "[h]e saw the plea of guilty . . . as his best chance to avoid the emotional response which would have surely come from a jury." R. 72-2, PageID 2123. In fact, Johnson's attorney noted that "there are probably more [crime-scene] photos in this case than [he had] ever seen in any other case, there are more photos and videotape of that

crime scene, that are going to come in before a jury," and Johnson "knew that." *Id.* at 2122. The record thus shows that, even if the trial court had complied with its *Boykin* obligations, Johnson still would have pleaded guilty to avoid a jury trial. So his guilty-plea claim fails under *Brecht*.